*1179 OPINION
By the Court,
Steffen, C. J.:
A jury convicted Vernell Ray Evans (Evans) of burglary and four counts of first-degree murder. After a penalty hearing, the jury found that the mitigating circumstances did not outweigh the aggravating circumstances and imposed four death sentences. The district judge entered a consecutive ten-year term for the burglary conviction. Evans raises numerous issues on appeal.

FACTS

At approximately 1:00 a.m. on May 1, 1992, officers Thomas Carpenter and Phil Miller of the Las Vegas Metropolitan Police Department (LVMPD), responded to a four-year-old child’s report that someone had been shot in the bathroom of a Wardelle Street apartment. The residents of that apartment (Apartment D), included Samantha Scotti (Samantha), her eighteen-month-old son Francois, and Alicia Ventura (Alicia) along with her four-year-old daughter Adriana and eight-month-old daughter Ashley.
Upon arrival, the two officers heard music playing inside the apartment and noticed that the front door was open. When the officers announced their presence and no one responded, they looked inside the apartment. The officers saw a leg extending from beneath bedcovers in the room down a hallway and a small child sitting on the floor, crying. After observing two lifeless bodies in the front room they decided to search the apartment for survivors.
The two officers discovered four victims in the apartment — all prey to fatal gunshot wounds. Jermaine Woods (Jermaine) lay on his stomach on the floor amidst a large pool of blood around his head. He had been shot once in the back of the head. They found the second victim, Steven Walker (Steven), slumped over on the couch with a pool of blood beside his head and down the side of his body.[1] He had been shot once in the head, just above his left *1180 eyebrow. Samantha was found in the bathtub. She had been shot approximately eight times, with entry wounds to her head, neck, face, left shoulder, right breast, left forearm and hand, right hand and upper arm. The gunshot wound to her left hand caused severe damage to all four fingers and the gunshot wound to her right hand tore up the palm. Her death was caused by either the shot to the face or the one to the left shoulder, which punctured her left lung. There were also indications of a possible blunt force injury to Samantha’s head. They found the fourth victim, Lisa Boyer (Lisa), in bed with a bloody pillow on her chest. She succumbed to three gunshot wounds: one to the right upper chest area, and two to her left arm, with the bullets entering her left breast.
The police officers also observed an open window above the bed where Lisa lay and a screen on the ground below the window. There was, however, no evidence of a forced entry. Every door in the apartment was open. A plant had been pulled out of its pot, and the cover to the reservoir of the toilet was out of place. A purse on the bathroom counter contained a receipt from Lucky’s market with the time and date stamped at 11:42 p.m., April 30, 1992. Investigators relied on this receipt to narrow the times of death.
Laboratory tests revealed that the projectile recovered from Jermaine’s head was consistent with bullets fired from a .38 special or a .357 magnum, as was the projectile recovered from Steven’s head. The deformed projectile removed from Steven’s body prevented a positive match with the gun that was used to kill Jermaine.
One projectile found in Samantha’s body was consistent with a 9-millimeter weapon; whereas, two projectiles came from the same .38 special or .357 magnum used to kill Jermaine. A third projectile was also consistent with a .38 special or .357 magnum, but was too deformed to allow for a positive match to the gun used to kill Jermaine or Steven. All three projectiles fired into Lisa were consistent with the 9-millimeter used to shoot Samantha.
Identification Specialist James Sheets lifted latent fingerprints from the inside surface of one of the sliding doors to the hallway closet, from the hallway wall near the thermostat, and near a picture in the hallway. The palm print lifted from the closet door matched Evans’ left palm. The other prints were matched to Everett Flowers (Evie). It is noteworthy that both Evans and Evie previously lived in that apartment. Evans lived there when Alicia moved in during March or April 1992, but moved out approximately two weeks later. Evie, Lisa’s boyfriend, moved out of the apartment on the day before Easter, 1992.
*1181 Four-year-old Adriana witnessed the murders and testified at trial.[2] She testified that the apartment door was unlocked and two men came into the apartment carrying guns. Adriana referred to the armed intruders as “Scary Eyes” and “Little Ray.” They said “hi” to Jermaine and Steven, and then shot them. Adriana followed the men into the bathroom where they shot Samantha. The two men then went into the bedroom and shot Lisa. Adriana could not remember how many times the women were shot or which one of the men fired the shots. Adriana did not see how the men left the apartment, but sometime thereafter, Alicia, Adriana’s mother, attempted to call Samantha. Adriana answered the telephone and told her mother that Samantha was dead. After the conversation, Adriana went to the apartment next door and told the neighbor that everyone had been killed.
Adriana testified that she did not know “Scary Eyes,”[3] but she had seen “Little Ray” before at Samantha’s. Adriana was unable to identify Evans as “Little Ray” either in court or in a lineup at the jail. Apparently, Adriana was too frightened to make a reliable identification. However, Alicia testified that Adriana usually referred to Evans as either “Little Ray” or “Uncle Ray.”
Alicia, of course, had left the apartment before the murders. Although she was able to give an account of events at the apartment during the afternoon and evening hours of April 30, 1992, it is unnecessary to recount the details as they have little bearing on the evidence elicited against Evans. Suffice it to say that four men (two at a time) showed up at the apartment. Steven, who was already at the apartment, was a member of a gang that rivaled a gang to which two of the men belonged. Additionally, one of the men called Samantha a “snitch bitch” and wanted to fight her. Eventually the four men left.
Lisa also arrived at the apartment while the four men were there. She was trying to get away from her boyfriend, Evie, who had recently put a gun to her head and threatened to kill her.
Between 7:00 p.m. and 7:30 p.m., Alicia received a telephone call. Although the caller did not identify himself, Alicia recognized Evans’ voice. Evans said something to the effect that: “I don’t know why you’re living with that snitch bitch [Samantha] still. She’s gonna get it some day.” Alicia told Samantha about *1182 the call, but she was unfazed because it wasn’t the first time she had been threatened. Nevertheless, Samantha and Steven left the apartment at approximately 9:00 p.m. to pick up Jermaine and secure guns for protection.
Alicia and her infant daughter left for a friend’s apartment at 10:30 p.m. so that she could do her laundry. Lisa, Adriana, Francois and two men from next door remained in the Wardelle Street apartment. When Alicia arrived at the friend’s apartment at approximately 11:00 p.m., another man was also there.[4] Evie called while Alicia was at Pitchford’s apartment and asked whether Lisa was over at Samantha’s apartment. Alicia said she was not and immediately called Lisa at Samantha’s to warn her not to answer Samantha’s phone.[5]
At approximately 12:00 a.m., Alicia returned a call that Samantha had made during one of her trips to the laundry room. Samantha sounded normal and asked Alicia to bring 210 rocks of cocaine back to the apartment.[6] Alicia retrieved the rock cocaine and called home at approximately 12:30 a.m. Adriana sounded nervous when she answered the telephone and said, “Uncle Ray, Little Ray came in with the guns, shot everybody, everybody’s dead.” Alicia didn’t believe Adriana and told her that Samantha was probably sleeping. Adriana said, “No. Uncle Ray, Little Ray came in with the guns, the bad man, and shot everybody.” Alicia told Adriana to take Francois and go to the apartment next door. When Alicia called back a few minutes later, no one answered, prompting Alicia to return to her apartment.
When Alicia talked to Adriana after her interview with the police, Adriana said “Uncle Ray and the bad man and Scary Eyes — Bogeyman Eyes and — came in with the real guns, with the brown clothes, and shot everybody.”[7]
*1183 Jeffery Grice (Grice), his wife, son, and a family friend, Aaron Sledge (Sledge), lived in Apartment C, next door to the crime scene.[8] According to Grice, around 7:00 p.m. on April 30, 1992, Grice took Samantha and an African-American male to Lucky’s market.
Later, at approximately 11:00 p.m. or 11:30 p.m., Grice was in his bathroom and heard what sounded like at least four gunshots. Sledge twice tried to call next door to see what was happening, but no one answered. They then heard loud music coming from Apartment D. Fifteen minutes later, Adriana was “pounding” on Grice’s door. When Grice let Adriana into his apartment, she said “They’re all dead. They’re all dead. They came and they shot them all dead. . . . Uncle Ray-Ray came in, and they shot them all dead. They were wearing brown. They were dressed down in brown. . . . They shot Samantha in the bathtub.”
Shirannah Rice (Rice) testified that Evans had admitted his involvement in the murders to her.[9] Rice previously had a romantic relationship with Evans and had been friends with both Steven and Jermaine. During a conversation on November 8, 1992, Rice told Evans that she believed Jermaine and Steven had been killed by someone they knew because they always carried guns and were always watching their backs. Evans told her that the police questioned him and a guy named “Double R”[10] after the murders.
Evans then told Rice that Samantha had been working for the police and had set up Double R in a drug deal, for which he went to jail. Double R had figured out that Samantha set him up; therefore, he wanted to kill her upon his release. Evans said “they” planned to kill Samantha. On the night of the riots in West Las Vegas following the Rodney King verdicts, Evans “called his home boy” and said it would be the perfect night to kill Samantha because the cops were otherwise occupied. Evans *1184 said that he went to Apartment D and knocked on the door. A girl answered, let him in, and then went into the bedroom. Evans stayed in the living room and talked with Steven and Jermaine. At some point, Evans went outside “to spit” and returned to the apartment, leaving the door unlocked. Evans then signaled his partner from the window and “his home boy came in strapped.” Steven jumped up and asked what was happening, and Evans told him to take off his hat. Steven reached for his gun and Evans shot him in the head. Evans told Rice that Steven’s brains flew out onto the end table. Evans’ partner went into the bedroom while Evans asked Jermaine to remove his hat. Jermaine was in shock and asked Evans not to kill him because he wouldn’t tell anyone. Evans said, “Man, you know I gotta do this.” Evans then shot Jermaine, who “fell forward and [Evans] shot him again in the head.” Evans then went to the bedroom where he and his partner put a pillow over the girl and then “they” shot her. He told Rice that Steven, Jermaine, and Lisa were shot because “[t]hey were in the wrong place at the wrong time.” Next, they went into the bathroom to kill Samantha. Samantha pleaded for her life and apologized for what she had done. Rice thought Evans was getting a kick out of describing what they did to Samantha. “They shot her in the breast and in the hand, in — in the fingers, her finger, they shot her fingers off.” Evans said they wanted to torture her and make her suffer.
In another conversation a few months later, Evans told Rice that he was concerned Adriana could be a witness as she got older and that “they had better get her out of town if they know what’s best for her.”
Tina Jackson (Jackson) also testified regarding admissions Evans had made to her. While working as a dancer at the Crazy Horse Too, she met Evans and came to know him by the name of “Mousey.” She also knew Alicia and Adriana, and had spoken with them about the Wardelle Street murders.[11] Jackson testified that Evans and two other men came to her apartment in November 1992. At that time, Evans told her that he knew Alicia had been talking to her and that she had better not say anything. When Jackson said she did not know what he was talking about, he said, “Well, I know that you know. Yes, I did do it, and you better not *1185 saying [sic] nothin’.” He placed a gun and bullets on a table, and told Jackson that “those were for [her]” if she said anything.
When Evans appeared at the Crazy Horse Too bar later that night, he did not speak to Jackson. A few days later, Jackson encountered Evans at the Union Plaza. Evans approached her and basically repeated what he had said in her apartment. He pushed her against a wall and told her to keep her mouth shut. Afraid of Evans, Jackson soon left the Las Vegas area.
Joseph Salley (Salley), the father of Alicia’s youngest child, Ashley, testified as a rebuttal witness regarding admissions made to him by Evans. In July 1992, Salley was present when Double R and Evie described their exploits. Double R described how “his homey,” indicating Evans, had shot Salley’s homey, Steven. Double R said that Steven tried to pull his gun and Evans “blasted him.” Evie claimed that a woman’s hands had been shot. At some point during this discussion, Evans jumped up and exclaimed that he was a “born killer.”
Two y/eeks later, Salley met Double R and Evans to purchase crack cocaine from them. Evans told Salley that he was lucky Evans liked him and that Salley had better pay Double R his cut after selling the crack, otherwise: “I’ll have to do you like I did your homeys [Steven and Jermaine].” Evans also said that Steven and Jermaine had been in the wrong place at the wrong time because “they’d” (the killers) gone there to take care of “two bitches.”
At the conclusion of the guilt phase of trial on September 10, 1994, the jury found Evans guilty of burglary and four counts of first-degree murder.
The penalty phase commenced on September 26, 1994. The State presented evidence indicating that Evans had a 1992 felony conviction for leaving the scene of an accident, a 1989 felony conviction for battery with the use of a deadly weapon, and that he was facing drug trafficking and parole violation charges. Members of the victims’ families testified about their losses.
In mitigation, Evans offered his youthful age, the testimony of Dr. Roitman, and the testimony of family members. Dr. Roitman testified that although Evans was not mentally ill, he suffered from anxiety illness. His family testified that he was not a bad person and asked for mercy on his behalf. Evans also exercised his right of allocution. Although he did not specifically take responsibility for the murders, he said that he had made mistakes in his life and would change them if he could. He expressed concern for his family and daughter, and then asked the jury to consider giving him a life sentence.
The jury returned death penalty verdicts on all four counts of first-degree murder. The jury found that the three aggravating *1186 circumstances offered on each murder count were established beyond a reasonable doubt, and that they were not outweighed by mitigating circumstances. Evans thereafter appealed, raising numerous issues.

DISCUSSION

Guilt Phase Issues

Jury pool

Evans contends that his jury was not drawn from a representative cross-section of the community.[12] Specifically, Evans insists that African-Americans were underrepresented in his jury pool.
Both the Fourteenth and the Sixth Amendments to the United States Constitution guarantee a defendant the right to a trial before a jury selected from a representative cross-section of the community. Holland v. Illinois, 493 U.S. 474 (1990); Taylor v. Louisiana, 419 U.S. 522 (1975). The fair-cross-section requirement mandates that “the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.” Taylor, 419 U.S. at 538. However, there is “no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population.” Holland, 493 U.S. at 483.
The defendant bears the burden of demonstrating a prima facie violation of the fair-cross-section requirement. To demonstrate a prima facie violation, the defendant must show:
(1) that the group alleged to be excluded is a “distinctive” group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.
Duren v. Missouri, 439 U.S. 357, 364 (1979) (emphasis added). The Duren Court explained that “systematic exclusion” means “underrepresentation . . . inherent in the particular jury-selection *1187 process utilized.” Id. at 366. Once the defendant has made out a prima facie violation of the fair-cross-section requirement, the burden shifts to the government to show that the disparity is justified by a significant state interest. Id. at 367.
That African-Americans are a “distinctive” group is undisputed. See Vasquez v. Hillery, 474 U.S. 254, 262 (1986) (exclusion of African-Americans from the jury pool violates the fair-cross-section requirement). However, Evans fails to satisfy the second prong of Duren. Evans’ jury was drawn from a pool of seventy-five people,[13] including seven African-Americans. Apparently, Evans contends that the fair-cross-section requirement should be determined based on the composition of the jury pool after the jury pool is death-qualified pursuant to Morgan v. Illinois, 504 U.S. 719 (1992) and Witherspoon v. Illinois, 391 U.S. 510 (1968).[14] Evans offers no legal authority to support his proposition. We therefore will consider the second Duren prong based upon a venire composed of seventy-five persons, including seven African-Americans. See McKinney v. Sheriff, 93 Nev. 70, 71, 560 P.2d 151, 151 (1977) (stating that contentions unsupported by authority are to be summarily rejected).
African-Americans comprised 9.3% of Evans’ venire. According to the jury composition study relied upon by Evans, the 1990 U.S. Census data for Clark County revealed that 8.3% of the population consisted of African-Americans 18 years of age and over. Thus, the absolute disparity between the representation of African-Americans in Evans’ venire and the general population positively favored Evans’ area of concern. The positive absolute disparity in this case would also indicate a lower comparative disparity.[15] After reviewing relevant case law, the Idaho Court of Appeals observed that “a comparative disparity well below 50% is unlikely to be sufficient [to show underrepresentation], especially where the absolute disparity also is small.” State v. Lopez, 692 P.2d 370, 377 (Idaho Ct. App. 1984). We agree, and conclude that Evans has failed to establish a prima facie violation of the fair-cross-section requirement.

*1188
Admissibility of testimony from Joseph Salley

1. Violation of exclusion order
At the beginning of trial, the judge ordered all witnesses excluded pursuant to NRS 50.155,[16] the witness-exclusion rule. Evans objected to testimony from one of the State’s rebuttal witnesses, Joseph Salley, because Salley had been in the courtroom during the first two days of the trial in violation of the court’s exclusion order. The State was unaware of Salley’s presence in the courtroom until defense counsel asked that Salley be prohibited from testifying on that basis. Although the district court did not specifically rule on the objection to Salley’s testimony, the court did mention that it believed the proper remedy was something short of prohibiting the testimony. Salley was permitted to testify, prompting Evans to raise an assignment of error.
In Rainsberger v. State, 76 Nev. 158, 350 P.2d 995 (1960), we had occasion to interpret a prior, similar witness-exclusion rule. The Rainsberger court held that it was prejudicial error to preclude a defense witness from testifying because he had been sitting in the courtroom in violation of an exclusion order where the witness misunderstood the order, was only in the courtroom for five minutes, and the defense had no knowledge of his presence. Id. at 161-62, 350 P.2d at 996-97. We explained that “[wjhile a violation of the [exclusion order] may subject a witness to punishment such as contempt of court and will affect his credibility it will not of itself operate to render the witness incompetent to testify.” Id.
In Givens v. State, 99 Nev. 50, 657 P.2d 97 (1983), overruled on other grounds by Talancon v. State, 102 Nev. 294, 721 P.2d 764 (1986), this court explained that “[tjhe purpose of sequestration of witnesses is to prevent particular witnesses from shaping their testimony in light of other witnesses’ testimony, and to detect falsehood by exposing inconsistencies.” Id. at 55, 657 P.2d at 100. With this purpose in mind, the Givens court held that “because requiring the requesting party to prove that actual prejudice occurred would be overly harsh and unjust, we will presume prejudice from a violation of NRS 50.155 unless the record shows that prejudice did not occur.” Id. After reviewing the record, the court in Givens determined that there was no prejudice to the defendant because the testimony of one of the *1189 witnesses who was in the courtroom could not have been influenced by the testimony he heard, and the other two witnesses who listened to testimony already had testified and were not called in rebuttal. Id. at 55-56, 657 P.2d at 100.
A review of the record reveals no evidence that Salley was influenced by the testimony given in his presence. Salley's testimony did not directly relate to the testimony occurring during the first two days of trial when he was present in violation of the exclusion order. Additionally, the defense used a transcript and tape recording of Salley's initial statement to the police in order to point out any inconsistencies. We therefore conclude that the purpose of excluding witnesses was not undermined in this case and Evans was not prejudiced.
Evans asks us to assume prejudice because Salley might have realized that the prosecution's case during those first two days was weak and that Salley would need to give strong incriminating evidence when he testified in order to help the prosecution. Although this argument presents an element of appeal, to recognize it as dispositive would be tantamount to creating a virtually irrebuttable presumption of prejudice whenever an exclusion order is violated. This we decline to do.
2. Unnoticed alibi rebuttal witness
Evans objected to Salley being called as a rebuttal witness on the additional ground that the State had failed to give the notice required by NRS 174.087(2).[17] The district court overruled the objection, finding that: (1) Salley's testimony would be fair rebuttal to the entirety of the defense case, not just alibi; and (2) there was good cause to waive the notice requirement because the State had experienced difficulty in locating Salley. Evans contends that this was error.
NRS 174.087(5) allows the district court to exclude evidence offered by the State in rebuttal to the defendant's evidence of alibi where the State fails to file and serve on the defendant the list of witnesses required by subsection 2. However, "[for good cause shown the court may waive the requirements of this section." *1190 NRS 174.087(5). “[T]he court’s discretion should be exercised whenever good cause appears,” and a finding of good cause will be upheld on appeal absent a manifest abuse of discretion. Williams v. State, 97 Nev. 1, 5, 620 P.2d 1263, 1266 (1981).
The primary purpose of NRS 174.087 is to “counter-balance the ease with which an alibi can be fabricated, the government’s interest in protecting against a belated defense and the ‘suspect nature’ of alibi testimony.” Williams, 97 Nev. at 3, 620 P.2d at 1265. This court has stated that the exclusion provisions should not be “ ‘blindly’ ” employed to “ ‘make the criminal prosecution a game.’ ” Id. (quoting Founts v. State, 87 Nev. 165, 169, 483 P.2d 654, 656 (1971)).
We conclude that the district court did not abuse its discretion in determining that the State had shown good cause for its noncompliance with NRS 174.087. Although the State endorsed Salley as a witness and issued a subpoena for him on August 4, 1994, it had been unable to locate him until shortly before the occasion for his rebuttal testimony. Moreover, contrary to Evans’ representations below and on appeal, the discovery provided to Evans indicates that Salley told police that Evans (identified in Salley’s statement as “Little Ray”) had made admissions to him regarding Evans’ involvement in the Wardelle Street murders. Thus, the potential for surprise which NRS 174.087 seeks to prevent, was not as great in this case.[18] Finally, the district court adjourned for the day to allow defense counsel to prepare for Salley’s testimony. Under these circumstances, the district court did not abuse its discretion.

Jury instructions

1. Reasonable doubt
The reasonable doubt instruction[19] given at both the guilt and *1191 penalty phases of Evans' trial mirrors the language mandated by NRS 175.211(1). This court repeatedly has upheld the use of NRS 175.211(1) as a jury instruction. See, e.g., Bollinger v. State, 111 Nev. 1110, 1114-15, 901 P.2d 671, 674 (1995); Canape v. State, 109 Nev. 864, 871-72, 859 P.2d 1023, 1028 (1993), cert. denied, 513 U.S. 862, 115 5. Ct. 176 (1994); Lord v. State, 107 Nev. 28, 38-40, 806 P.2d 548, 554-56 (1991). Evans objected to the reasonable doubt instruction and raises two challenges on appeal.
First, Evans assigns error to the statutory reasonable doubt instruction, asserting that it is unconstitutional under the holding in Cage v. Louisiana, 498 U.S. 39 (1990) (plurality opinion) ("substantial" and "grave" doubt based on a juror's "moral" certainty as opposed to the reasonable doubt standard based on evidentiary certainty violates Due Process Clause). We have ruled otherwise, see, e.g., Lord, 107 Nev. at 38-40, 806 P.2d at 554-56,[20] and do so again today.
Next, Evans assigns error to the statutory reasonable doubt instruction, asserting that the "weighty affairs" language lessens the prosecution's burden of proof by equating the jury's decisions with everyday decisions that, unlike a guilty verdict or death sentence, can be changed at a later date. We previously have rejected a similar argument, explaining that the "weighty affairs" language did not create a reasonable likelihood that the jury applied the instruction unconstitutionally where the jury was also instructed regarding the State's burden of proof and the presumption of innocence. Bollinger, 111 Nev. at 1114-15, 901 P.2d at 674. Such instructions were given here. Accordingly, we reject Evans' contentions on this issue.
2. Premeditation
The premeditation instruction[21] given in this case mirrors that *1192 approved by this court in Powell v. State, 108 Nev. 700, 708-10, 838 P.2d 921, 926-27 (1992), vacated on other grounds, 511 U.S. 79 (1994). Evans assigns error to the instruction, arguing that it blurs the line between first and second-degree murder because deliberation requires more than “instantaneous” premeditation. Evans further contends that the district court improperly rejected an instruction proffered by the defense defining deliberation.[22]
In Powell, this court approvingly observed that other jurisdictions viewed “premeditated, deliberate, and willful” as used to define first-degree murder as a single phrase, meaning that the defendant intended to kill. Id. Furthermore, “[a]s long as the instruction on premeditation which is given to the jury comports with [Briano v. State, 94 Nev. 422, 581 P.2d 5 (1978)], it is not necessary to separately define deliberateness or willfulness.” Id. at 709-10, 838 P.2d at 927. This court then concluded that the premeditation instruction, identical to the one challenged in the case at bar, constituted an accurate definition. Id. at 710, 838 P.2d at 927.
We conclude that the reasoning set forth in Powell remains sound and that there is no reason for this court to reexamine the meaning of the phrase “deliberate, premeditated, and willful” at this time.

*1193
Motion for acquittal notwithstanding the verdict

Evans contends that the district court used an incorrect standard in deciding whether to grant his motion for an acquittal notwithstanding the verdict. He insists that the correct standard “is one in which the district court makes an independent evaluation of the evidence presented, including the credibility of the witnesses.” We disagree. Evans has confused the standard that a district court must use in deciding whether to grant a motion for an acquittal pursuant to NRS 175.381(2) with that used in deciding whether to grant a motion for a new trial pursuant to NRS 176.515(4).
This court has held that “other grounds” for a new trial exist under NRS 176.515(4) where the trial judge finds that the evidence of guilt is conflicting, and after an independent evaluation of the evidence, disagrees with the jury’s verdict of guilty. See State v. Purcell, 110 Nev. 1389, 887 P.2d 276 (1994); Washington v. State, 98 Nev. 601, 655 P.2d 531 (1982). We have explained that
a conflict of evidence occurs where there is sufficient evidence presented at trial which, if believed, would sustain a conviction, but this evidence is contested and the district judge, in resolving the conflicting evidence differently from the jury, believes the totality of evidence fails to prove the defendant guilty beyond a reasonable doubt.
State v. Walker, 109 Nev. 683, 685-86, 857 P.2d 1, 2 (1993).
However, a district court lacks authority to grant a new trial based on insufficiency of the evidence; when there is truly insufficient evidence to convict, a defendant must be acquitted. Purcell, 110 Nev. at 1394-95, 887 P.2d at 279. Accordingly, where there is insufficient evidence to support a conviction, the trial judge may set aside a jury verdict of guilty and enter a judgment of acquittal. NRS 175.381(2). “In contrast to conflicting evidence, insufficiency of the evidence occurs where the prosecution has not produced a minimum threshold of evidence upon which a conviction may be based, even if such evidence were believed by the jury.” Id. at 1394, 887 P.2d at 279 (emphasis added). Clearly, this standard does not allow the district court to act as a “thirteenth juror” and reevaluate the evidence and the credibility of the witnesses.
It is apparent that Evans has confused the standards to be used in deciding whether to grant these two motions. The referenced *1194 cases demonstrate that there is a marked difference between a motion for a new trial and a motion for an acquittal. This difference has also necessitated the use by a trial court of two very different standards in the resolution of the two motions. If the new trial standard were applied to a motion for an acquittal, then the trial judge could act as a thirteenth juror, acquit the defendant notwithstanding the jury’s contrary verdict and, consequently, prevent the State from reprosecuting the defendant. We therefore reject Evans’ interpretation of the standard to be used by a district court in deciding whether to grant a motion for an acquittal. Further, we conclude that the trial judge used the correct standard in denying Evans’ motion for an acquittal notwithstanding the verdict. Finally, we also conclude from our review of the record that there was sufficient evidence upon which to base Evans’ conviction.

Penalty Phase Issues

Aggravating circumstances

In its Notice of Intent to Seek Death Penalty, the State indicated its intention to present evidence regarding the following six aggravating circumstances at the penalty hearing:
1. The murder was committed by a person who was previously convicted of a felony involving the use or threat of violence to the person of another, to-wit: Battery With Use of a Deadly Weapon. NRS 200.033(2).
2. The murder was committed by a person who knowingly created a great risk of death to more than one person by means of a weapon, device or course of action which would normally be hazardous to the lives of more than one person. NRS 200.033(3).
3. The murder was committed while the person was engaged in the commission of or an attempt to commit any Burglary. NRS 200.033(4).
4. The murder was committed to avoid or prevent a lawful arrest or to effect an escape from custody. NRS 200.033(5).
5. The murder involved torture, depravity of mind or the mutilation of the victim. NRS 200.033(8).
6. The murder was committed upon one or more persons at random and without apparent motive. NRS 200.033(9).
Evans filed pretrial motions to strike all but the first of the aggravating circumstances (prior conviction for a violent felony). The district court addressed Evans’ motions at the beginning of the penalty phase and struck the third (burglary) and the sixth (random and without apparent motive) aggravators, but denied Evans’ motion to strike the other aggravating circumstances.
*1195 At the conclusion of the penalty hearing, the jury returned four death sentences. In the course of its deliberations, the jury found that aggravators one, two, and four were established beyond a reasonable doubt in the murders of Lisa, Steven, and Jermaine. As to Samantha’s death, the jury found that aggravators one, two, and five were established beyond a reasonable doubt. In all instances, the jury found that there were no mitigating circumstances sufficient to outweigh the aggravating circumstances.
On appeal, Evans contends that the evidence did not warrant the district court’s instructions to the jury regarding the following aggravating circumstances: two (great risk of death to more than one person) as to all of the murders; four (prevention of lawful arrest) as to the murders of Lisa, Steven and Jermaine; and five (torture, depravity of mind, or mutilation) as to Samantha’s murder.
1. Great risk of death to more than one person
Evans contends that the evidence did not warrant an instruction based upon NRS 200.033(3) because (1) the murders were not the result of indiscriminate gunfire; and (2) each of the victims was an intended victim. We disagree.
This court has explained:
It is of no consequence to multiple victims of a violent crime whether their deaths or injuries result from a weapon directed at each victim specifically or by random shootings or the use of a scattergun or other weapon of broader impact. . . . Obviously, one who intends to commit multiple murders within a closely related time and place engages in a course of conduct inherently hazardous to the life of more than one person.
Hogan v. Warden, 109 Nev. 952, 959, 860 P.2d 710, 715 (1993) (emphasis added). Accordingly, we have upheld this aggravator in cases where the perpetrator shot his victim in the presence of other people. See, e.g., id. at 957, 860 P.2d at 714; Moran v. State, 103 Nev. 138, 143, 734 P.2d 712, 715 (1987).
In the instant case, Evans discharged his weapon in an apartment occupied by six people. The fact that he used a firearm to intentionally commit multiple murders within a closely related time and place, constitutes a course of conduct inherently hazardous to the life of more than one person as contemplated by NRS 200.033(3). See Hogan, 109 Nev. at 959, 860 P.2d at 715.
2. Prevention of lawful arrest
Evans also challenges the use of the prevention of lawful arrest *1196 statutory aggravator, NRS 200.033(5), arguing that the evidence adduced at trial fails to show that his dominant motive[23] for killing Steven, Lisa, and Jermaine was to avoid arrest for a specific crime, or that these three victims knew him well enough to identify him. As further support for his contention that the evidence did not warrant an instruction on this aggravating circumstance, Evans cites Jimenez v. State, 105 Nev. 337, 343, 775 P.2d 694, 698 (1989), where this court granted the appellant’s request for a new penalty hearing because there was no basis in fact for the jury to find that the murders had been committed to prevent lawful arrest or to escape. Evans’ contentions are merit-less.
This court has held that the arrest need not be imminent and the victim need not actually be involved in effectuating an arrest for purposes of NRS 200.033(5). Cavanaugh v. State, 102 Nev. 478, 486, 729 P.2d 481, 486 (1986) (aggravator upheld where the defendant murdered his victim to prevent the victim from contacting law enforcement about the defendant’s participation in a fraudulent scheme to purchase furniture with forged checks). In a recent case, Canape v. State, 109 Nev. 864, 859 P.2d 1023 (1993), cert. denied, 513 U.S. 862, 115 S. Ct. 176 (1994), the evidence produced at trial indicated that Canape robbed his victim near the victim’s car, and then forced him to walk a distance from the freeway, where Canape shot him in the back. This court concluded that based on the evidence, a jury could reasonably infer that the murder was committed to avoid lawful arrest. Id. at 874-75, 859 P.2d at 1030.
Unlike Jimenez, here sufficient evidence existed to justify the court giving an instruction regarding the aggravator concerned with killing to prevent a lawful arrest. Evans and his accomplice went to the apartment to kill Samantha. Shirannah Rice testified that Evans told her that Lisa, Steven, and Jermaine were shot because they “were in the wrong place at the wrong time.” Moreover, the fact that Adriana and Francois were spared is not inconsistent with the prevention of lawful arrest aggravating factor. Eighteen-month-old Francois presented no identification threat whatsoever, and it is likely that Evans believed four-year-old Adriana would not be able to tie him to the crimes.
Finally, Evans’ contention that the State never showed that *1197 Lisa, Jermaine, and Steven knew Evans to the extent that they could identify him, is disingenuous. We decline to give so narrow an interpretation to NRS 200.033(5) as to preclude its use whenever the perpetrator is a stranger to his or her murder victim.
3. Torture, depravity of mind, or mutilation
Evans also challenges the “torture, depravity of mind, or mutilation” statutory aggravator, NRS 200.033(8),[24] as applied to Samantha, because the evidence does not show that Evans fired the shots which mutilated her hand or otherwise tortured her; therefore, the jury would have been unable to make the necessary culpability determination as to this aggravating factor.
Evans cites Enmund v. Florida, 458 U.S. 782, 797 (1982), where the Supreme Court held that the Eighth Amendment prohibits the imposition of the death penalty on a defendant who aids and abets a felony (in Enmund, a robbery) in the course of which a murder is committed by others, but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force be used. Evans also cites Tison v. Arizona, 481 U.S. 137, 158 (1987), where the Court held that major participation in a felony that resulted in murder, combined with the defendant’s reckless indifference to human life is sufficient to satisfy the Enmund culpability test even if the defendant is not the killer. The EnmundITison determination can be made by a jury, trial judge, or an appellate court. Cabana v. Bullock, 474 U.S. 376, 386-87 (1986).
Based upon Enmund and Tison, this court has held that: “To receive the death sentence, appellant must have, himself, killed, attempted to kill, intended that a killing take place, intended that lethal force be employed or participated in a felony while exhibiting a reckless indifference to human life.” Doleman v. State, 107 Nev. 409, 418, 812 P.2d 1287, 1292-93 (1991). Although it is *1198 preferable that the sentencing body make this determination, this court will do so on appeal. Id. at 417, 812 P.2d at 1292.
The record in this case reflects ample evidence that Evans, himself, killed, attempted to kill, or intended that a killing take place when he participated in the killings on May 1, 1992. The evidence adduced at trial indicated that Evans was not only present at the murder scene, but helped plan and carry out the murders. The evidence also supports the conclusion that Evans intended to make Samantha suffer.
Shirannah Rice testified that Evans told her that “they” shot Samantha in the hands and that they wanted to torture her. Therefore, we conclude that Evans was an integral part of the murders committed on May 1, 1992, and directly culpable in the torture and mutilation of Samantha Scotti. We further conclude that the number and location of the gunshot wounds suffered by Samantha Scotti warranted an instruction on “torture, depravity of mind, or mutilation” as an aggravating circumstance. See Rogers v. State, 101 Nev. 457, 468, 705 P.2d 664, 671-72 (1985), cert. denied, 476 U.S. 1130 (1986).

Penalty phase evidence

Evans contends that he should have been allowed to present the sentencing jury with evidence regarding a federal district court’s conclusion that the government had failed to prove Richard Powell’s involvement in the Wardelle Street murders by even a preponderance of the evidence.[25] Evans did not attempt to introduce this evidence at the penalty phase based upon the trial judge’s ruling during the guilt phase that the evidence was irrelevant and inadmissible hearsay.[26] Because the trial judge admonished Evans’ attorneys “not to in any way again try to get [the evidence] in,” they believed that the ruling applied to the penalty phase as well.
First, Evans waived any objection regarding the admissibility of the evidence at the penalty phase by failing to offer it. The guilt phase and the penalty phase in a capital case are separate proceedings. See NRS 175.552. What is irrelevant and inadmissible in one may be relevant and admissible in the other. Additionally, evidentiary rules are less stringent in the penalty phase of trial. *1199 Under Nevada law, evidence which may or may not ordinarily be admissible under the rules of evidence may be admitted in the penalty phase of a capital trial, NRS 175.552, as long as the questioned evidence does not draw its support from impalpable or highly suspect evidence. Young v. State, 103 Nev. 233, 237, 737 P.2d 512, 515 (1987). Thus, an evidentiary ruling occurring in the guilt phase of trial based upon such concerns as relevancy and hearsay does not have automatic application to the separate penalty phase proceeding. Nevertheless, given the severity of Evans’ punishment, we will consider the merits of Evans’ contention.
Evans directs our attention to Mak v. Blodgett, 970 F.2d 614 (9th Cir. 1992), cert. denied, 507 U.S. 951 (1993), wherein the court held that evidence from which it might be inferred that Mak’s co-defendant and a third party planned the massacre for which Mak was convicted should have been admitted during the penalty phase because it contradicted the prosecution’s theory that Mak was the planner and thus was relevant to his relative culpability. The Mak court concluded that the evidence was relevant to capital sentencing under the holding in Eddings v. Oklahoma, 455 U.S. 104 (1982).[27] Evans contends that the “Powell evidence” was relevant to his sentencing because it related to the circumstances of the offense.
The evidence excluded in the case at bar is distinguishable from that excluded in Mak. The final decision reached by the federal court with respect to Powell in no way relates to Evans’ relative culpability. Moreover, Evans was not precluded from introducing evidence suggesting that the State’s theory of the case was wrong, that he had a lesser involvement in the crimes, or that he deserved a sentence less than death. Finally, the federal court’s decision regarding Powell was based upon a different standard and less evidence than that presented against Evans. Indeed, it appears that the State had a stronger case against Evans due, in part, to witness testimony regarding admissions Evans had made. We therefore conclude that the federal court’s final decision in Powell’s case was not material or related to the circumstances of the instant prosecution.

Motion for mistrial

The trial judge reacted with emotion to the penalty phase *1200 testimony from members of the victims’ families, prompting the defense to move for a mistrial. The judge denied the motion, stating that his mere display of emotion upon hearing a mother talk about her dead child is insufficient for a mistrial and that he would probably experience the same feelings after hearing testimony from the defendant’s family members. At the conclusion of the defendant’s case in the penalty phase of trial, the defense moved again for a mistrial “based on the obvious lack of emotion showed today after the defense witnesses testified compared to yesterday.” The trial judge again denied the motion. Evans maintains that the district court erred by denying his motions and that the error denied him a fair penalty hearing.
The decision to deny a motion for a mistrial rests in the sound discretion of the trial court and it will not be disturbed on appeal unless there is a clear showing of abuse. See Owens v. State, 96 Nev. 880, 620 P.2d 1236 (1980). Both Evans and the State focus their arguments on a judge’s impartiality and the potential for prejudice to a defendant being sentenced by an impartial judge. However, because the jury, not the trial judge, was the sentencing authority in this case, we conclude that the more appropriate inquiry is whether the show of emotion by the judge influenced the jury in a manner that was prejudicial to Evans. Cf. People v. Rogers, 800 P.2d 1327 (Colo. Ct. App. 1990) (reversible error for trial judge to escort child-victim to and from witness stand in a prosecution for sexual assault because jury could have perceived action as endorsement of child’s credibility, and action thus impinged on right to fair trial); People v. Martinez, 652 P.2d 174 (Colo. Ct. App. 1981) (judge should not comment upon the evidence or the credibility of a witness); State v. Ciskie, 751 P.2d 1165 (Wash. 1988) (same).
In order to determine the impact the judge’s conduct may have had upon the jury, it is necessary to review both the extent and nature of that conduct. The record does not contain a video or audio recording. However, the trial judge gave the following description of what happened:
Now, in terms of what happened, in terms of actual tears, I think that during the four women who testified, the four mothers, there was one tear in the corner of my eye and I looked up at the light and rubbed it out. I think in terms of the admonishment, my voice probably shook with emotion during the entire reading of the admonishment and I’m sure that’s what the recording would show.
When Evans’ counsel made the second motion for a mistrial, the trial judge observed: “I think my voice shook throughout the *1201 entire admonishment yesterday. My perception was, it didn’t during the admonishment today but it did when I was excusing Mr. Evans’ mother, and may have also when I was excusing the two sisters of Mr. Evans.”
We conclude that it is highly unlikely that the jury viewed this minor show of emotion by the judge following the testimony by the victims’ families and the perceived lessening of emotion following the testimony of Evans’ family, as an indication of the witnesses’ credibility or the appropriate sentence.[28] We therefore conclude that this issue is without merit.

Lingering doubt

Evans assigns error to one penalty phase instruction given to the jury.[29] He also argues that the district court improperly rejected another. Both contentions involve the concept of lingering doubt as a possible mitigating factor.
The district court gave Jury Instruction No. 18 at the conclusion of the penalty phase. This instruction informed the jury:
In your deliberation you may not discuss or consider the subject of guilt or innocence of a defendant, as that issue has already been decided. Your duty is confined to a determination of the punishment to be imposed.
Evans contends that this instruction was prejudicial because it would make it impossible for the jury to consider lingering doubts of guilt as a possible mitigating factor. Along these same lines, Evans proffered the following instruction:
The fact that it may be considered as a factor in mitigation, if you have a lingering or residual doubt as to the guilt of the defendant, even if such was not sufficient to raise a reasonable doubt in the guilt phase.
Although the district court rejected the proffered instruction, the *1202 district court decided that Evans would be allowed to argue lingering or residual doubt in the closing argument.
In Riley v. State, 107 Nev. 205, 808 P.2d 551 (1991), a penalty phase instruction identical to Jury Instruction No. 18 was challenged on the ground that it improperly precluded the jury from weighing the evidence of guilt as a possible mitigating factor. This court rejected the challenge, explaining that because the penalty phase of a capital case is conducted after the defendant has been found guilty of first-degree murder, the issue of guilt should not be addressed again by the jury. Id. at 215, 808 P.2d at 557. Our ruling in Riley is dispositive of this issue; Jury Instruction No. 18 was proper.
Moreover, the district court did not err in refusing Evans’ instruction listing residual doubt as a mitigating circumstance. In Homick v. State, 108 Nev. 127, 141, 825 P.2d 600, 609 (1992), we held, in accord with the Supreme Court’s ruling in Franklin v. Lynaugh, 487 U.S. 164 (1988), “that there is no constitutional mandate for a jury instruction in a capital case making residual doubt a mitigating circumstance.” The Court reasoned that lingering doubts over a defendant’s guilt do not constitute an aspect of the defendant’s character, record, or a circumstance of the offense. Franklin, 487 U.S. at 174.
However, the district court decided that even though Homick stated that an instruction on lingering doubt should not be given, under its interpretation of Riley, the defense would still be permitted to argue lingering doubt in its closing argument. Evans’ attorney did argue lingering doubt during closing and tried to explain that Jury Instruction No. 18 did not preclude the jury from considering lingering doubt as a mitigating circumstance. In rebuttal, the prosecutor argued that lingering doubt was not a proper consideration and that Jury Instruction No. 18 “is very clear and most unequivocal, that this is not a time to consider guilt or innocence; this is the time to consider the punishment to be imposed.” Although Evans failed to object to the prosecutor’s comment, Evans now contends that the district court improperly allowed the comment which contradicted the court’s earlier ruling.
We discern nothing in our holding in Riley that would suggest that lingering doubt may be argued as a mitigating circumstance. Indeed, the instruction upheld in Riley effectively precludes the jury from considering lingering doubt because to do so it would have to reconsider the defendant’s guilt or innocence, a subject *1203 clearly foreclosed by the instruction. The following additional statement in Riley may be responsible for the apparent confusion: “Further, while the jury was not at liberty to reevaluate their guilty verdicts, they were nonetheless instructed that they could consider the evidence produced at trial in deciding whether the death penalty was appropriate.”[30] Riley, 107 Nev. at 215, 808 P.2d at 557. What this statement means is that the jury may consider all of the facts and circumstances of the crime in determining the appropriate sentence. This is completely consistent with and, in fact, mandated by the Supreme Court’s holding in Eddings.
However, it does not suggest that lingering or residual doubt as to the defendant’s guilt or innocence is an appropriate consideration at the time of sentencing. Therefore, the only error on this issue favored Evans when the district court allowed defense counsel to address lingering doubt during closing argument.

Jury’s understanding of mitigating circumstances

During the jury’s deliberations concerning the appropriate sentence to impose, the jury foreman sent a note to the trial judge requesting a “Black’s Law or proper definition” of mitigating circumstances. Before the judge could respond, however, the jury returned with a verdict imposing four death sentences. The trial judge nevertheless granted a request by the defense, over the State’s objections, that the jury be given an instruction answering the jury’s question,[31] and be ordered to deliberate again. Five to ten minutes later, the jury again returned a verdict imposing four death sentences.
Evans maintains that even though the jury received a definition of mitigating circumstances, “it is apparent that they gave that definition no consideration” because they returned with the first verdict before receiving their requested definition, and after receiving the requested definition, they returned a verdict after deliberating “only long enough to sign the new verdict forms.” Evans concludes that the jury could not possibly have given proper consideration to the mitigating evidence he presented because the jury did not understand the meaning of “mitigating circumstances.”
*1204 Evans correctly notes that a sentencing body may not nullify or neutralize the weight of mitigating evidence by excluding such evidence from its consideration, Saffle v. Parks, 494 U.S. 484, 490 (1990), and that the death penalty must not be imposed in an arbitrary or irrational manner, Parker v. Dugger, 498 U.S. 308, 321 (1991). However, we are persuaded that the jury was properly instructed and that there is no evidence to indicate that the jury ignored the evidence adduced in mitigation.
The jury was instructed concerning the mitigating circumstances presented by Evans. Additionally, Penalty Phase Instruction No. 16 provided, in relevant part:
The mitigating circumstances which I have read for your consideration are given only as examples of some of the factors you may take into account as reasons for deciding not to impose a sentence of death on the defendant. Any aspect of the defendant’s character or record and any of the circumstances of the offense, including any desire you may have to extend mercy to the defendant, which a jury believes is a basis for imposing sentence less than death may be considered a mitigating factor. Any one of them may be sufficient, standing alone, to support a decision that death is not the appropriate punishment in this case.
(Emphasis added.) Evans never objected to the adequacy of these instructions and we conclude that they were sufficient and proper instructions to the jury on the subject of mitigating circumstances. Moreover, the additional instruction defining mitigating circumstances clarified any possible confusion. This court has always presumed that the jury abided by its duty to read and consider all instructions provided by the trial court. See Lambert v. State, 94 Nev. 68, 70, 574 P.2d 586, 587 (1978). We further reject the argument that the jury failed to consider the mitigating evidence presented by Evans based solely upon the length of the jury’s deliberations.

Prosecutorial misconduct

The relevant inquiry when reviewing a prosecutor’s comments is whether the comments were so unfair that they deprived the defendant of due process. Darden v. Wainwright, 477 U.S. 168, 181 (1986). “[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor’s comments standing alone, for the statements or conduct must be viewed in context; only by *1205 so doing can it be determined whether the prosecutor’s conduct affected the fairness of the trial.” United States v. Young, 470 U.S. 1, 11 (1985). Accordingly, comments that are harmless beyond a reasonable doubt do not warrant reversal. Witherow v. State, 104 Nev. 721, 724, 765 P.2d 1153, 1155 (1988).
During the penalty phase rebuttal closing argument, the prosecutor commented:
As a policy judgment in 1977 our legislature decided that it was appropriate to have capital punishment in the state of Nevada. So whatever your decision may be in this courtroom, you share the responsibility at least with the legislators—
[objection interposed and overruled]
I suggest it’s a denigration of the criminal justice system to attempt to equate the legitimate effort to find punishment which fits the crimes with simply a primal barbarian urge for revenge.
Ladies and gentlemen, there were police officers involved in the investigation of this case. You heard from both former Detectives Dibble and Scholl. Surely they share responsibility in what was done. They pursued the investigation; they submitted a case to the Office of the District Attorney. The Office of the District Attorney has been the charging entity in this case. The Judge has presided over the trial.
I’m simply saying that you have a specific role within the criminal justice system. But the parameters were already established before you came to this courtroom; it was already in place that there are punishments available for a murder of the first degree.
It’s certainly my earnest hope that regardless of what you conscientiously and objectively and honestly decide, that you aren’t going to be lured into feeling guilty about what you’ve done. You’re not guilty of anything, except discharging your civic responsibility to the best of your ability.
Evans argues that these statements amount to an impermissible inference that the jury shares its responsibility in determining the appropriate sentence. We disagree.
Evans cites Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985), where the Supreme Court held that “it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant’s death rests *1206 elsewhere.” In Caldwell, the prosecutor responded to defense counsel’s statement that the jury faced an “awesome responsibility,” with the following comment:
Now, they would have you believe that you’re going to kill this man and they know — they know that your decision is not the final decision. My God, how unfair can you be? Your job is reviewable. . . .
For they know, as I know, and as Judge Baker has told you, that the decision you render is automatically reviewable by the Supreme Court.
Id. at 325-26. The Court questioned the reliability of the sentence as well as the jury’s bias in favor of the death sentence for a number of reasons when the prosecutor suggested to the sentencing jury that it could shift its sense of responsibility to an appellate court. Id. at 330-34. For example:
Even when a sentencing jury is unconvinced that death is the appropriate punishment, it might nevertheless wish to “send a message” of extreme disapproval for the defendant’s acts. This desire might make the jury very receptive to the prosecutor’s assurance that it can more freely “err because the error may be corrected on appeal.”
Id. at 331 (quoting Maggio v. Williams, 464 U.S. 46, 54-55 (1983) (Stevens, J., concurring in judgment)).
The prosecutor’s comments in the instant case did not rise to the level of those condemned in Caldwell. Although the prosecutor told the jury that it “share[d] the responsibility at least with the legislators,” the comment appears to have been meant as a response to attempts by the defense to make the jury feel guilty if they returned a death sentence. The prosecutor never suggested that the jury must impose the death sentence merely because the legislature had decided that it is an available punishment, nor did the prosecutor suggest that the responsibility for determining the appropriate sentence rested elsewhere. Rather, the prosecutor sought to make it clear that the legislature had made the determination that life with or without the possibility of parole, and death are available sentences for first-degree murder and that it was now the jury’s responsibility to determine which sentence was appropriate in Evans’ case. We therefore conclude that the prosecutor’s comments were not improper.[32]

*1207
Mandatory review of propriety of death penalty

NRS 177.055(2)[33] mandates this court’s review of every death sentence. Pursuant to the statutory requirements, and in addition to the issues raised by Evans and resolved as discussed above, we have determined that each of the aggravating circumstances found by the jury was supported by substantial evidence. Additionally, our careful review of the record has revealed no evidence indicating that Evans’ death sentences were imposed under the influence of passion, prejudice or any arbitrary factor. We therefore hold that the death sentences were not imposed under the influence of any such factors. Finally, we have concluded that the death sentences Evans has received are not excessive considering Evans as a person, and the gravity and circumstances of his crimes.

CONCLUSION

For the reasons discussed above, we conclude that Evans was fairly tried, convicted and sentenced. Accordingly, we affirm the judgment entered by the district court in all respects, including the four death sentences.
Young, Shearing, and Rose, JJ., concur.

A white Motorola beeper was located between Steven’s feet and a loaded .380 Walther semi-automatic pistol was discovered in his right front pants pocket.

 Adriana was six-years-old at the time she testified.

On April 15, 1994, Adriana testified at Richard Powell’s sentencing hearing following his conviction on a federal drug trafficking charge. The federal prosecutor tried to use Powell’s involvement in the Wardelle Street murders to obtain an upward departure from the sentencing guidelines. At Powell’s sentencing, Adriana had referred to the shooters as “Little Ray” and “Scary Eyes.” She identified Powell as “Scary Eyes.” Powell has never been charged in the Wardelle Street murders.

The defense presented evidence to suggest that Alicia’s friend, Dushawn (Cat) Pitchford, had committed the murders while carrying out a contract that Samantha’s fiance, Anthony (Ace) Collins, had put out on Samantha. The defense also presented evidence to suggest that Brian (Clay) Hardy, the other man who was with Pitchford when Alicia arrived to do her laundry, had a motive to kill Samantha because she had informed on him.

The defense suggested that Evie was one of the killers based on his abusive relationship with Lisa, including his threat to kill her just days before her murder.

Alicia was supposed to get the drugs from Samantha’s safe, which Pitchford had hidden for them in a location near his apartment. Until a week prior to the murders, the two female victims had kept the safe in Apartment D. They moved it after several robberies.

Alicia’s memory of Adriana’s statements varied. On May 1, 1992, she told an LVMPD detective that Adriana had said there were four men. In a statement taken on July 28, 1992, Alicia said Adriana had told her that Evie was there. Then, before the grand jury, Alicia testified that Adriana told her *1183 that “Little Ray shot Samantha and Lisa.” At trial, Alicia testified that Adriana said it was Ray Evans, Evie Flowers, and Scary Eyes or Bogeyman Eyes. It should be noted that other suspects remain in the killings that occurred in Apartment D.

There are four apartments at the Wardelle Street address. The two upstairs Apartments D and C share a common wall.

The defense presented Evans’ girlfriend, Donna Matthews, as an alibi witness. She testified that she spent the entire day and evening of April 30, 1992 with Evans at her apartment. Evans spent the night with her. Matthews did not come forward until contacted by the defense.

Rice did not know Double R, but Evans said that he lived next door to Double R. Other witnesses established that Double R is one of Powell’s nicknames.

The story which Jackson claimed Alicia told her about the murders is completely inconsistent with the established facts. Jackson’s statement to the police, which she affirmed at trial, was that “Alicia had said that her and her daughter, a girl named Chris, and another little girl that was supposed to have been named Michelle was over [at] this girl Chris’s house and said they had seen Mousey [Evans] come in mad, come in, went into the bedroom, shot one lady that was supposed to be pregnant several times, and shot two other people.”

Evans also challenged the district court’s denial of his motion for jury selection pursuant to statute. His arguments are without merit. Evans failed to demonstrate a material departure from the jury selection statutes or the Eighth Judicial District Court’s rules, and also failed to show that he was prejudiced by the selection procedure. See State v. Rice, 844 P.2d 416, 422 (Wash. 1993).

The trial judge indicated there were 72 people in the jury pool.

Two African-Americans in Evans’ venire were excused because they would always vote to impose the death penalty; a third was excused because she would never impose a penalty of death.

Unlike the absolute disparity, the comparative disparity takes into account the size of the group in addition to the absolute difference between the group’s proportionate representation in the community and its representation in the jury pool. State v. Lopez, 692 P.2d 370, 376 (Idaho Ct. App. 1984).

NRS 50.155 provides, in relevant part:
1. Except as otherwise provided [,]... at the request of a party the judge shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and he may make the order of his own motion.

NRS 174.087(2) provides:
Not less than 10 days after receipt of the defendant's list of witnesses, or at such other times as the court may direct, the district attorney shall file and serve upon the defendant the names and last known addresses, as particularly as are known to the district attorney, of the witnesses the state proposes to offer in rebuttal to discredit the defendant's alibi at the trial of the cause.

See also Victor v. Nebraska, 511 U.S. 1, 14-15, 114 S. Ct. 1239, 1247 (1994) ("An instruction cast in the terms of an abiding conviction as to guilt, without reference to moral certainty, correctly states the government's burden of proof"); Canape, 109 Nev. at 872, 859 P.2d at 1028 (reaffirming Lord).

The premeditation instruction given to the jury reads:
*1192 Premeditation is a design, a determination to kill, distinctly formed in the mind at any moment before or at the time of the killing.
Premeditation need not be for a day, an hour or even a minute. It may be as instantaneous as successive thoughts of the mind. For if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the premeditation is followed by the act constituting the killing, it is willful, deliberate and premeditated murder.

At trial Salley did testify as to a second admission which did not appear in his original statement to the police. The defense focused on this point and made it a credibility issue for the jury.

The instruction reads:
The defendant is presumed innocent until the contrary is proved. This presumption places upon the State the burden of proving beyond a reasonable doubt every material element of the crime charged and that the defendant is the person who committed the offense.
A reasonable doubt is one based on reason. It is not mere possible doubt but is such a doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors, after the entire *1191 comparison and consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt. Doubt to be reasonable must be actual, not mere possibility or speculation.
If you have a reasonable doubt as to the guilt of the defendant, he is entitled to a verdict of not guilty.

Evans’ proffered instruction reads:
Premeditation is a design, a determination to kill distinctly formed in the mind at any moment before or at the time of the killing.
Deliberate means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed cause of action.
The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances.
The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not such deliberation and premeditation as will fix an unlawful killing as murder of the first degree.

As support for his “dominant motive” argument, Evans relies primarily on Florida case law. See, e.g., Herzog v. State, 439 So. 2d 1372 (Fla. 1983) (the prevention of lawful arrest aggravator “may be applicable when the fact finder determines that the dominant motive of the murder was for the elimination of witnesses”).

Prior to a 1995 amendment, NRS 200.033(8) provided that first-degree murder may be aggravated where “[t]he murder involved torture, depravity of mind or the mutilation of the victim.” To ensure that this aggravator is applied in a constitutional manner, this court held that NRS 200.033(8) requires “torture, mutilation or other serious and depraved physical abuse beyond the act of killing itself, as a qualifying requirement to an aggravating circumstance based in part upon depravity of mind.” Robins v. State, 106 Nev. 611, 629, 798 P.2d 558, 570 (1990), cert. denied, 499 U.S. 970 (1991). The requisite limiting instruction was given in this case.

The government had sought to use Powell’s involvement in the Wardelle Street murders to obtain an upward enhancement of Powell’s sentence for a federal drug trafficking conviction.

Evans has not appealed the exclusion of this evidence at the guilt phase.

In Eddings, the Supreme Court held that the “sentencer [may] not be precluded from considering, as a ‘mitigating factor, any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.’ ” 455 U.S. at 110 (quoting Lockett v. Ohio, 438 U.S. 586, 604 (1978) (emphasis in original)).

Although we conclude that there was no prejudice or abuse of discretion in this case, we urge the district courts to give a standard instruction to the jury to the effect that the jury is not to be influenced by anything the judge might have said or done. For example, a pattern preliminary instruction used in the Ninth Circuit, regarding the duty of the jury, includes the following language: “You should not take anything I may say or do during the trial as indicating what I think of the evidence or what your verdict should be.” Committee on Model Jury Instructions Ninth Circuit, Model Criminal Jury Instructions for the Ninth Circuit, in Modern Federal Jury Instructions 9-1, § 1.01 (1991).

Evans also challenges the reasonable doubt instruction given during the penalty phase. We rejected, and again reject, the same contentions with respect to the identical instruction given during the guilt phase.

Evans’ jury received a similar instruction.

The jury was given the following instruction: “Mitigating circumstances are things which do not constitute a justification or excuse of the offense in question, but which in fairness and mercy may be considered as extenuating or reducing the degree of moral culpability.”

Evans also cites the following cases: Mazzan v. State, 105 Nev. 745, 783 P.2d 430 (1990) (addressing prosecutor’s statements that they should use the sentence to “set a standard” and threatening the jury with social pressure); Dawson v. State, 103 Nev. 76, 734 P.2d 221 (1987) (addressing prosecutor’s *1207 comments that allegedly expressed an opinion about the defendant’s guilt and the appropriate sentence); Jones v. State, 101 Nev. 573, 707 P.2d 1128 (1985) (addressing prosecutor’s request that the jury be fair to the victim); Collier v. State, 101 Nev. 473, 705 P.2d 1126 (1985) cert. denied, 486 U.S. 1036 (1988) (“moral community” comments). The prosecutor’s comments in the case at bar do not implicate any of these cases.

NRS 177.055(2) provides:
2. Whether or not the defendant or his counsel affirmatively waives the appeal, the sentence must be reviewed on the record by the supreme court, which shall consider, in a single proceeding if an appeal is taken:
(a) Any errors enumerated by way of appeal;
(b) Whether the evidence supports the finding of an aggravating circumstance or circumstances;
(c) Whether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor; and
(d) Whether the sentence of death is excessive, considering both the crime and the defendant.