130 Nev., Advance Opinion 76

IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| JOHN MATTHIAS WATSON, III, Appellant, vs. THE STATE OF NEVADA, Respondent. | No. 56721 |



FILED

OCT 02 2014

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY
CHIEF DEPUTY CLERK

Appeal from a judgment of conviction in a death penalty case. Eighth Judicial District Court, Clark County; Kathy A. Hardcastle, Judge.

*Affirmed.*

Philip J. Kohn, Public Defender, and Howard S. Brooks, Deputy Public Defender, Clark County, for Appellant.

Catherine Cortez Masto, Attorney General, Carson City; Steven B. Wolfson, District Attorney, and Ryan J. MacDonald, Deputy District Attorney, Clark County, for Respondent.

BEFORE THE COURT EN BANC.

*OPINION*

By the Court, GIBBONS, C.J.:

A jury found appellant John Watson, III, guilty of first-degree kidnapping and first-degree murder of his wife and sentenced him to death for the murder. In this appeal from the judgment of conviction, we focus primarily on two of Watson's claims.

14-32731

First, we consider whether the district court erred in concluding that Watson failed to demonstrate a prima facie case of discrimination for the purpose of a *Batson*[1] challenge to the State's use of peremptory challenges to remove female veniremembers. We hold that the district court did not clearly err in concluding that the State's use of six of its nine peremptory challenges to remove female veniremembers did not give rise to an inference of discrimination where the percentage of the State's peremptory strikes used against female veniremembers was not so disproportionate to the percentage of females in the venire as to give rise to an inference of purposeful discrimination and the defense offered no other circumstances supporting such an inference.

Second, we consider whether the district court plainly erred in instructing the jury that mitigating circumstances are those circumstances which "reduc[e] the degree of the Defendant's moral culpability." Although mitigating circumstances are not limited to those that reduce a defendant's moral culpability and jury instructions should not convey otherwise, we are not convinced that there is a reasonable likelihood that the jury understood the instruction in this case to limit the scope of mitigating circumstances. Because we conclude that these and Watson's other claims of error do not warrant relief, we affirm the judgment of conviction.

*FACTS AND PROCEDURAL HISTORY*

Watson told family members that his wife, Evirelda "Evey" Watson, went missing while they were on a trip to Las Vegas following her

---

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986).

birthday in July 2006. The ensuing investigation of Evey's reported disappearance led to evidence that Watson planned the trip to Las Vegas for the purpose of killing Evey and that he killed her in a Las Vegas hotel room and disposed of her body. Evey's body was never found. Watson was charged with first-degree kidnapping, first-degree murder with the use of a deadly weapon, and robbery. The State filed a notice of intent to seek the death penalty.

*Guilt phase*

In June 2006, Watson told a friend that he believed that Evey was going to leave him and take half of his life savings. He said that he was mad enough to kill her and claimed to know of places he could hide her body where it would never be found.

On July 9, 2006, Watson threw a surprise birthday party for Evey's 50th birthday. He had also planned a trip to Las Vegas as a present for Evey. After the party, Watson drove to Las Vegas. He checked into three rooms at two different hotels on July 10, 2006. At the Circus Circus, he checked in under his own name, but he checked into the Tuscany Suites under the name Joe Nunez. He had booked the room at the Tuscany Suites weeks earlier. When making the reservation, he had requested a specific room—N120—but that room was not available and he was given room N114. At the time of his arrival, Watson also booked another room (N118) at the Tuscany Suites for Sal Nunez and checked into that room as well. Evey flew to Las Vegas the following day, July 11, 2006, to join Watson. The next day, Watson called his son, Michael, and said that Evey had befriended a woman from Henderson and was missing.

Watson stayed in Las Vegas for three more days. On July 13, 2006, the day after he called Michael, Watson used his credit card to

purchase antifreeze at a Walmart. In a separate cash transaction, he procured bleach, an incense holder, and incense. In a nearby home improvement store, Watson paid cash for a band saw and the tools necessary to assemble it. The next day, July 14, 2006, Watson requested a move to room N120 at the Tuscany Suites—the room he had requested when he made his reservation. After he moved to that room, he declined maid service. He checked out of both hotels the next day.

Watson then contacted Evey's cousin, Mira Alvarez. During a phone call, he told her that Evey walked away from him after an argument and he did not know where she was. He said that he did not file a missing person report because he believed that the police would suspect him of foul play. He added that Evey had cut her finger in the back of his Jeep while opening a flashlight package. Watson showed up at Alvarez's home on July 16, 2006. At that time, he claimed that Evey had called and told him that she was getting a ride with a woman she had met. Watson's son, Juan, came to Alvarez's house while Watson was there. Watson told Juan that he and Evey had a fight in front of the Four Queens casino. He also showed Alvarez and Juan a letter allegedly written by Evey that he had found in his car. The letter indicated that Evey went to Guatemala because her sister, Rose, had been in an accident. Alvarez doubted the letter's authenticity. According to her, Rose had not been in an accident, and the letter did not appear to be written by Evey.

Juan reported Evey missing that day, and later in the day, Watson was taken into custody. During the arrest, police confiscated identification bearing Watson's photograph and the name "Joseph Ernest Nunez, Jr." A search of Watson's Jeep Cherokee revealed several blood spots in the vehicle and evidence that it had been cleaned with a bleach-

based cleanser. Blood found on the seatbelt, rear bumper, and cardboard in the vehicle had a DNA profile that was consistent with Evey's DNA. In addition, the Jeep contained bleach, cleaners, rubber gloves, a roll of plastic tarp, paperwork from Circus Circus, a Circus Circus casino card, and a card from Tuscany Suites. A search of Watson's home revealed a box of trash bags, from which 17 bags were missing; a box cutter with blood stains matching Evey's DNA, and a plastic bag with a blood stain consistent with Evey's and Watson's DNA. Juan later found a gun in the Watson home and turned it in to the police. Blood spots on the gun barrel matched Evey's DNA.

Evidence was also located in room N120 at the Tuscany Suites. In turning over the room, housekeeping staff had collected several kitchen utensils and a Teflon pan, which they turned over to the police. The bed sheets were also missing and the room contained trash from stores, scissors, and incense. The scissors appeared to have brown stains on them. In addition, staff noted an overwhelming odor. A housekeeper at Tuscany Suites testified that the guest in room N120 had asked her for a large trash bag on the day he left. Crime scene analysts discovered Evey's DNA in blood found in several stains recovered from the bathroom of room N120. Investigators also collected a piece of carpet from the room that was stained with blood matching Evey's DNA. The blood stain on the carpet had soaked through the carpet and padding and had stained the cement subfloor.

Watson was released from custody in late July and was placed under surveillance. Officers observed Watson drive around the mountain roads in the area of Kern County, California. Near Lake Isabella, Watson was observed turning onto a dirt road, stopping his car, and walking away

from it. Officers searched this area, commonly known as the Fairview dump, and discovered an area of the ground that appeared to have been recently disturbed with plastic protruding from it. The plastic recovered from the hole matched the type and tear pattern of a roll of plastic tarp recovered from Watson's Jeep. DNA found on the plastic matched Evey's DNA profile. Investigators who recovered the plastic bundle from the hole noted that it smelled of decomposition.

On August 10, 2006, Watson was arrested at a Denny's in Claremont, California. He was in possession of a wig, false mustache, and glue. He also had a bus ticket to El Paso, Texas, a map of El Paso, cash, traveler's checks, driver's licenses in his name and the name of Zach Watson, a cell phone, and a list of phone numbers. Michael spoke to Watson after his arrest, and Watson implied that if Michael put money in Watson's jail fund then he would tell Michael of a general area where Evey's body could be found.

After hearing this evidence, a jury found Watson guilty of first-degree kidnapping and first-degree murder with the use of a deadly weapon. The jury unanimously agreed that the murder was willful, deliberate, and premeditated and occurred during the commission of the kidnapping offense. The jury acquitted Watson of robbery.

*Penalty phase*

The State alleged three aggravating circumstances to support a death sentence: (1) the murder occurred while Watson was engaged in the crime of first-degree kidnapping with the use of a deadly weapon, (2) the murder was committed for pecuniary value, and (3) the murder involved torture or mutilation. In addition to the evidence introduced

during the guilt phase, the State introduced letters that Watson had written to his children in which he stated that Evey had shot herself in the hotel room and Watson, believing he would be held responsible for her death, attempted to conceal her death. Watson admitted in the letters that he cut up Evey's body, cooked parts of it, wrapped the pieces in plastic, and disposed of them. He could not remember exactly where he disposed of her body. The State also presented evidence of Watson's violent character, including that he had been charged with threatening President Nixon when he was 29 years old and had been charged with extortion for taking his young child from his prior wife and demanding money from her parents to return the child. In addition, the State introduced evidence that Watson, when in an argument with his prior wife, had boasted that he had raped and killed a hitchhiker but that an investigation into that statement did not yield any evidence of a murder and no charges were filed.

In mitigation, Watson introduced records from his admissions to psychiatric hospitals and his adjudication of insanity in 1958, when he was 18 years old. The records showed that Watson had been admitted to Parkland Memorial Hospital on August 23, 1957. Doctors had tentatively diagnosed him with schizophrenia and later diagnosed him with sociopathic personality disorder. The records noted that Watson was repeatedly referred to juvenile authorities for thefts, burglaries, and other similar crimes between 1951 and 1955. He ran away from home in 1956 with the intent to commit suicide. In 1957, he exposed himself to a secretary at a radio station and threatened her with a knife, which led to the commitment at Parkland. After he was discharged from Parkland, Watson committed another crime and was adjudicated insane on July 26,

1958. Watson was admitted to Rusk State Hospital on October 31, 1958, and discharged on November 1, 1960. He spent the last ten months of his admission on furlough. Watson also spoke in allocution, expressing his desire to be given the death penalty in accordance with his Muslim faith.

The jury found that the murder occurred while Watson was engaged in the crime of first-degree kidnapping and that the murder involved the torture and mutilation of the victim. None of the jurors found any mitigating circumstances. The jury unanimously found that the aggravating circumstances outweighed the mitigating circumstances and imposed a sentence of death for Evey's murder.

## DISCUSSION

Watson argues that numerous errors occurred during the guilt and penalty phases of the trial. Although we address all of the claimed errors, we focus on two in particular. As to the guilt phase, we focus on his claim that the district court erred in rejecting his *Batson* challenge to the State's use of three peremptory challenges. As to the penalty phase, we focus on his challenge to the instruction defining mitigating circumstances.

### Guilt-phase issues

#### Juror challenges

In exercising its nine peremptory challenges, the State struck six women and three men and one of the State's peremptory challenges was used to remove an African-American veniremember. Watson asserted a *Batson* objection to the State's use of three peremptory challenges—two against female veniremembers and the one against an African-American veniremember. The district court rejected his objections and Watson

claims on appeal that the district court erred as to one of the women and the African-American veniremember. We first address the gender-based *Batson* claim and then the race-based *Batson* claim.

In *Batson v. Kentucky*, the United States Supreme Court held that the use of peremptory challenges "is subject to the commands of the Equal Protection Clause," and therefore a party may not "challenge potential jurors solely on account of their race." 476 U.S. 79, 89 (1986). The Court later expanded the scope of *Batson* to prohibit striking jurors solely on account of gender. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 140-43 (1994). We evaluate an equal-protection challenge to the exercise of a peremptory challenge using the three-step analysis set forth by the United States Supreme Court in *Batson*. *Kaczmarek v. State*, 120 Nev. 314, 332, 91 P.3d 16, 29 (2004); *see also Purkett v. Elem*, 514 U.S. 765, 767 (1995); *J.E.B.*, 511 U.S. at 144-45. First, "the opponent of the peremptory challenge must make out a prima facie case of discrimination." *Ford v. State*, 122 Nev. 398, 403, 132 P.3d 574, 577 (2006). "[T]he production burden then shifts to the proponent of the challenge to assert a neutral explanation for the challenge." *Id.* Finally, "the trial court must . . . decide whether the opponent of the challenge has proved purposeful discrimination." *Id.*; *see Johnson v. California*, 545 U.S. 162, 171 (2005) (noting the "burden of persuasion 'rests with, and never shifts from, the opponent of the strike'" (quoting *Purkett*, 514 U.S. at 768)). This court affords great deference to the district court's factual findings regarding whether the proponent of a strike has acted with discriminatory intent, *Diomampo v. State*, 124 Nev. 414, 422-23, 185 P.3d 1031, 1036-37

(2008), and we will not reverse the district court's decision "unless clearly erroneous." *Kaczmarek*, 120 Nev. at 334, 91 P.3d at 30.[2]

The district court rejected Watson's gender-based *Batson* objection after determining that Watson had failed to make out a prima facie case of discrimination—the first step of the *Batson* analysis. To establish a prima facie case under step one, the opponent of the strike must show "that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 93-94. This standard is not onerous and does not require the opponent of the strike to meet his or her ultimate burden of proof under *Batson*. *Johnson*, 545 U.S. at 170 (rejecting California's "more likely than not" standard to measure the sufficiency of a prima facie case). Rather, the opponent of the strike must provide sufficient evidence to permit the trier of fact to "draw an inference that discrimination has occurred." *Id.*; *see also State v. Martinez*, 42 P.3d 851, 857-58 (N.M. Ct. App. 2002). "An 'inference' is generally understood to be a 'conclusion reached by considering other facts and deducing a

---

[2]There is a split of authority as to whether the finding of a prima facie case of discrimination (step one of the *Batson* analysis) should be reviewed deferentially. It appears that a majority of the federal circuit courts of appeal, including the Ninth Circuit, have held that the "appellate court should review a trial court's *Batson* prima facie determination deferentially." *Tolbert v. Page*, 182 F.3d 677, 684-85 (9th Cir. 1999) (citing decisions of the First, Third, Fourth, Fifth, Eighth, and Eleventh Circuits); *see also United States v. Martinez*, 621 F.3d 101, 109-10 (2d Cir. 2010) (deciding to apply abuse-of-discretion standard). *But see Valdez v. People*, 966 P.2d 587, 590-91 (Colo. 1998) (discussing split and adopting mixed standard of review that gives deference to factual findings but applies de novo standard to whether opponent of strike established a prima facie case as a matter of law). The parties have not asked us to reconsider the standard of review used by this court.

logical consequence from them.'" *Johnson*, 545 U.S. at 168 n.4 (quoting *Black's Law Dictionary* 781 (7th ed. 1999)).

Watson takes issue with the district court's determination that he had not made a prima facie showing because he had not demonstrated a pattern of strikes against women. He argues that he is not required to show a pattern in order to make the prima facie showing required under *Batson*'s first step. Watson is correct—the opponent of a strike is not *required* to establish a pattern of strikes against members of the targeted group because the exclusion of even one veniremember based on membership in a cognizable group is a constitutional violation. *See generally Batson*, 476 U.S. at 96-97; *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994). But Watson still must make the prima facie showing required under *Batson*'s first step.

Where there is no pattern of strikes against members of the targeted group to give rise to an inference of discrimination, the opponent of the strike must provide other evidence sufficient to permit an inference of discrimination based on membership in the targeted group. *Vasquez-Lopez*, 22 F.3d at 902. In other words, the mere fact that the State used a peremptory challenge to exclude a member of a cognizable group is not, standing alone, sufficient to establish a prima facie case of discrimination under *Batson*'s first step; "something more" is required. *State v. Rhone*, 229 P.3d 752, 756 (Wash. 2010) (rejecting bright-line rule that peremptory challenge used against member of racially cognizable group is sufficient to establish a prima facie case under *Batson* because such a rule would be inconsistent with *Batson* as it "would negate this first part of the analysis and require a prosecutor to provide an explanation every time a member of a racially cognizable group is peremptorily challenged" and would be

inconsistent with what Washington court and other courts have held); *see also Vasquez-Lopez*, 22 F.3d at 902 ("The one fact supporting [the defendant's] *Batson* claim was the juror's status as the sole Black prospective juror. More was required."); *People v. Howard*, 175 P.3d 13, 25 n.10 (Cal. 2008) (noting that defendant is not required to show a pattern in order to make out a prima facie showing of discrimination but that the absence of a pattern is "significant" where the defense "provided no other basis for inferring discriminatory intent"). Aside from a pattern of strikes against members of a targeted group, circumstances that might support an inference of discrimination include, but are not limited to, the disproportionate effect of peremptory strikes, the nature of the proponent's questions and statements during voir dire, disparate treatment of members of the targeted group, and whether the case itself is sensitive to bias. *Batson*, 476 U.S. at 96-97 (prosecutor's questions and statements during voir dire); *Tolbert v. Page*, 182 F.3d 677, 683 (9th Cir. 1999) ("Whether or not 'all the relevant circumstances' 'raise an inference' of discrimination will depend on factors such as the attitude and behavior of the challenging attorney and the prospective jurors manifested during voir dire."); *Vasquez-Lopez*, 22 F.3d at 902 (impact of government's challenge on composition of jury and disparate treatment); *Martinez*, 42 P.3d at 855 (observing that courts may also consider whether a cognizable group has been eliminated from the jury altogether, was substantially underrepresented, or the case itself was sensitive to bias).

Watson suggests that the number of peremptory challenges that the State used to remove women (6 of its 9 peremptory challenges) constitutes a pattern of strikes that gives rise to an inference of gender-

based discrimination and therefore establishes a prima facie case of gender discrimination. He offers no supporting authority or analysis.

In a case involving a *Batson* claim based on gender discrimination, this court observed that "[w]hen a significant proportion of peremptories exercised by the State is used to remove members of a cognizable group, it tends to support a finding of purposeful discrimination." *Libby v. State*, 113 Nev. 251, 255, 934 P.2d 220, 223 (1997). Although there is "'no magic number of challenged jurors which shifts the burden to the government to provide a neutral explanation for its actions,'" *Turner v. Marshall*, 63 F.3d 807, 812 (9th Cir. 1995) (quoting *United States v. Chinchilla*, 874 F.2d 695, 698 (9th Cir. 1989)), *overruled in part on other grounds by Tolbert v. Page*, 182 F.3d 677 (9th Cir. 1999), in *Libby*, this court concluded that the use of seven of nine peremptory challenges to remove female veniremembers established a prima facie case of discrimination based on gender. 113 Nev. at 255, 934 P.2d at 223.

There are some flaws with *Libby*'s method of determining whether there is a pattern of strikes against members of a targeted group that gives rise to an inference of discrimination. *Libby* tallies the number of peremptory challenges used against members of the targeted group to determine whether there is a pattern of strikes against members of that group. The first problem with that method is that "the raw number of peremptory challenges used against targeted-group members is meaningless without some point of reference." Kenneth J. Melilli, *Batson in Practice: What We Have Learned About Batson and Peremptory Challenges*, 71 Notre Dame L. Rev. 447, 476 (1996). *Libby* did provide one point of reference—the total number of peremptory challenges used by the State. That point of reference has little meaning, however, without

SUPREME COURT
OF
NEVADA

(O) 1947A

13

additional information such as the number of targeted-group members remaining in the venire after the for-cause challenges. *Id.* ("[F]ive peremptory challenges against targeted-group members might be dispositive if only five such individuals had previously populated the venire, but they might be entirely unremarkable if virtually the entire venire had consisted of people in that group."). Although two of the cases discussed in *Libby* included information about this additional point of reference, *United States v. De Gross*, 913 F.2d 1417, 1425 (9th Cir. 1990) (seven of defendant's eight strikes used against male jurors and when defendant sought to use final peremptory strike to remove another male juror there were only two male jurors in the jury box and one remaining in the venire); *Haynes v. State*, 103 Nev. 309, 316, 739 P.2d 497, 502 (1987) (strikes exercised against the only African Americans on the panel), this court did not include that information with respect to Libby's venire. The second problem with the method used in *Libby* is that "it does not complete its task" because "it does not tell us how many such peremptory challenges constitutes a prima facie case." Melilli, *supra*, at 476. That flaw can lead to inconsistent decisions. *Id.*

The method used in *Libby* is just one of many "methods of quantifying the results of the peremptory challenges used by the *Batson* respondent." *Id.* at 471-72 (describing eight methods). While the method used in *Libby* has some relevance and may be sufficient to make out a prima facie showing of discrimination in some cases, there is another method that is better suited to gender-based *Batson* claims given the limited number of gender groups. A better approach would be to "compare[] the percentage of the *Batson* respondent's peremptory challenges used against targeted-group members with the percentage of

targeted-group members in the venire." *Id.* at 472. "The theory underlying this method is that, if targeted-group membership is irrelevant to the *Batson* respondent's use of peremptory challenges, then the portion of [those] strikes used against the targeted-group members ought to roughly parallel the portion of the venire which consists of members of that targeted group." *Id.*; *see also State v. Ouahman*, 58 A.3d 638, 642 (N.H. 2012) (addressing *Batson* challenge involving the exclusion of men and observing that where the panel against whom peremptory challenges could be exercised consisted of more men than women, there is a "higher likelihood that the State would strike male jurors"). We conclude that this method is preferable to the one used in *Libby*.

Here, the State used six of its nine peremptory challenges to remove women from the venire. This tally is close to, but not exactly the same as, the tally that established a prima facie case in *Libby* (seven out of nine peremptory challenges). When additional reference points are considered, the number of peremptory challenges used against women becomes less significant. The remaining venire, after all for-cause challenges were resolved, had more women (18) than men (14). It therefore would not be unexpected that neutrally exercised peremptory challenges would affect women more than men. Women constituted 56 percent of the venire after the for-cause challenges and the State used 67 percent of its strikes to remove women. In other words, roughly five out of nine members of the venire remaining after for-cause challenges were women, and the State used six of its nine strikes on women. Although there is some disparity between these percentages, they are roughly parallel, and the disparity is not as great as that in other cases where courts have found that a prima facie case had been established. *See, e.g.,*

*Fernandez v. Roe*, 286 F.3d 1073, 1078 (9th Cir. 2002) (prima facie case established where at the time of the *Batson* objection, the prosecutor had used 29 percent of his peremptory challenges to remove 57 percent of the Hispanic veniremembers, who only constituted 12 percent of venire); *Turner v. Marshall*, 63 F.3d 807, 813-14 (9th Cir. 1995) (prima facie case established where prosecutor used 56 percent of peremptory challenges to remove African-American veniremembers, who were only 30 percent of the venire that had been passed for cause), *overruled in part on other grounds by Tolbert v. Page*, 182 F.3d 677 (9th Cir. 1999). Thus, the State's use of six of its nine peremptory challenges against women, standing alone, was not sufficient to give rise to an inference of discrimination based on gender. *Cf. United States v. Martinez*, 621 F.3d 101, 110-11 (2d Cir. 2010) (concluding that defendant did not make prima facie showing where government exercised first four strikes against men where more than half of the prospective jurors were men at the start of the peremptory challenge stage, and by the time the government exercised its third and fourth challenges, the defense had removed seven women, making the odds nearly two to one that a male juror would be stricken). Watson does not identify any other evidence or circumstance that demonstrates a prima facie case of discrimination. We therefore conclude that he has not demonstrated that the district court clearly erred in determining that he failed to make out a prima facie case of gender discrimination.

Next, Watson contends that the district court erred in rejecting his *Batson* claim as to the State's use of a peremptory challenge to exclude an African-American veniremember. He argues that the State's removal of this veniremember violated *Batson* because its race-neutral reason related to the veniremember's religion.

We need not address Watson's argument because the district court correctly rejected Watson's *Batson* claim based on the first step of the analysis. The district court agreed with the State that Watson had not established a pattern of strikes against African Americans that would be sufficient to make out a prima facie showing of discrimination. Despite that determination, the district court asked the State to give its reasons for removing the veniremember "out of an abundance of caution." The district court's cautionary request that the State give its explanation for the peremptory challenge was laudable, but where the district court has "conclude[d] that a prima facie showing has not been made, the request for and provision of explanations does not convert a [first-step *Batson*] case into a [third-step] case." *People v. Howard*, 175 P.3d 13, 26 (Cal. 2008) (observing that although the court has "encouraged trial courts to ask prosecutors to give explanations for contested peremptory challenges, even in the absence of a prima facie showing," doing so does not make the first step of the analysis moot where the trial court has concluded that a prima facie showing has not been made). Because the district court asked the State to provide its explanation for the peremptory challenge solely out of an abundance of caution after the court had determined that Watson failed to make a prima facie case, the first step of the *Batson* analysis was not rendered moot. *Id.* at 25 ("When the trial court expressly states that it does not believe a prima facie case has been made, and then invites the prosecution to justify its challenges for the record on appeal, the question whether a prima facie case has been made is not mooted, nor is a finding of a prima facie showing implied."); *cf. Ford v. State*, 122 Nev. 398, 403, 132 P.3d 574, 577 (2006) (recognizing that first step of *Batson* analysis is moot where State "gave its reasons for its peremptory challenges before

the district court determined whether the opponent of the challenge made a prima facie showing of discrimination").

We agree with the district court's assessment of the first step. This is not a case where the State used all of its strikes to remove African Americans, used a percentage of its strikes to remove African Americans that was significantly greater than the percentage of African Americans in the venire, or used its strikes to remove all African Americans. Rather, the State used one peremptory challenge to remove an African-American veniremember, leaving three African Americans on the venire after the State exercised its strikes. Accordingly, there was no pattern of strikes against African Americans that would give rise to an inference of discrimination. Although Watson was not required to establish a pattern, he was required to establish facts or circumstances sufficient to support an inference of discrimination based on race. He failed to do so below or on appeal. Because Watson did not demonstrate an inference of discrimination and therefore failed to meet the first step of the *Batson* analysis, we conclude that the district court did not clearly err in denying the *Batson* objection.

*Sufficiency of the evidence*

Watson contends that there was insufficient evidence adduced at trial to convict him of first-degree murder and first-degree kidnapping. He argues that the conclusion that he lured his wife to Las Vegas with the purpose of killing her is based on speculation. He also asserts that, as Evey's body was not recovered, the circumstantial evidence produced at trial could only suggest, not conclusively prove, his involvement in Evey's death. We disagree.

We review the evidence in the light most favorable to the prosecution and determine whether any rational juror could have found the elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *McNair v. State*, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992). In doing so, we do not reweigh the evidence or determine credibility as those functions belong to the jury. *McNair*, 108 Nev. at 56, 825 P.2d at 573.

The jury heard the following evidence. Watson expressed a desire to kill his wife in the month before her disappearance. He then booked a hotel room in Las Vegas under an alias. The next month, Watson and Evey traveled to Las Vegas as a purported gift for her birthday. Watson drove to Las Vegas with a firearm, and Evey flew to the city the next day. Before Evey arrived, Watson checked into hotel rooms at Circus Circus under his name and Tuscany Suites under an alias. Evey was not heard from again. After Evey's disappearance, Watson purchased tools and cleaning supplies. Watson's rooms at the Tuscany Suites were left in disarray: sheets missing, discarded packaging, used incense, and a strong odor. Significant amounts of Evey's blood was found in the rooms at Tuscany Suites, including a large stain that had soaked through to the subfloor, and her blood was found in Watson's vehicle and on his gun. Officers also followed Watson to an area where they later discovered plastic that smelled of decomposition and was stained with Evey's blood. In addition, Watson had fabricated a note from Evey to explain her absence. Finally, he was apprehended in an apparent attempt to leave the country: he was near a bus station with a ticket to a border town and was in possession of another's identification as well as disguise elements. This is substantial evidence from which a rational juror could reasonably infer

that: (1) Watson lured Evey to Las Vegas for the purpose of killing her and therefore was guilty of first-degree kidnapping, NRS 200.310(1); and (2) Watson unlawfully killed Evey with malice aforethought and the killing was willful, deliberate, and premeditated and/or committed in the perpetration of a kidnapping, and therefore Watson was guilty of first-degree murder, NRS 200.010(1); NRS 200.030(1)(a), (b). *See Buchanan v. State,* 119 Nev. 201, 217, 69 P.3d 694, 705 (2003) (circumstantial evidence alone may sustain a conviction). We therefore will not disturb the jury's verdict. *See Bolden v. State,* 97 Nev. 71, 73, 624 P.2d 20, 20 (1981).

### *Motion for self-representation*

Watson contends that the district court erred in denying his motion to dismiss counsel and represent himself. He asserts that this was structural error that warrants reversal of his convictions.

The Sixth Amendment of the United States Constitution, made applicable to the states by the Fourteenth Amendment, guarantees a defendant the right to self-representation. *See Faretta v. California,* 422 U.S. 806, 819-20 (1975) ("The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails."). We have protected a competent defendant's Sixth Amendment "right not to have counsel forced upon him," even in instances where a defendant facing the death penalty opts to present no defense or mitigating evidence. *Bishop v. State,* 95 Nev. 511, 516-17, 597 P.2d 273, 276 (1979); *see also Colwell v. State,* 112 Nev. 807, 811-12, 919 P.2d 403, 406 (1996). However, the right to self-representation is not absolute because it necessitates the relinquishment of another constitutional right—the right to counsel. *See Faretta,* 422 U.S. at 835. Before allowing a defendant to waive his right to counsel, a district court must conclude that a defendant is competent to

waive his right to counsel and that he has made a knowing and voluntary waiver of this right. *See id.*; *see also Godinez v. Moran*, 509 U.S. 389, 400-01 (1993). A district court nonetheless may deny a request for self-representation that is untimely, equivocal, or made for the purpose of delay. *O'Neill v. State*, 123 Nev. 9, 17, 153 P.3d 38, 44 (2007) (quoting *Tanksley v. State*, 113 Nev. 997, 1001, 946 P.2d 148, 150 (1997)).

Watson's request for self-representation was equivocal. He had filed a motion to act as co-counsel and would not fully accept responsibility for his legal representation; he assured the district court that he could handle all aspects of his defense, except for the "details," deadlines, and ministerial tasks, and he indicated that he would ask for a continuance if he found he could not represent himself. These conditions on self-representation show that he never definitively acknowledged that he wanted to act as his own sole legal representative.[3]

Watson's motion also was untimely. "If it is clear that the request comes early enough to allow the defendant to prepare for trial without need for a continuance, the request should be deemed timely." *Lyons v. State*, 106 Nev. 438, 446, 796 P.2d 210, 214 (1990), *abrogated in part on other grounds by Vanisi v. State*, 117 Nev. 330, 341 & n.14, 22 P.3d 1164, 1172 & n.14 (2001). Watson filed his motion roughly one month before the scheduled trial date, and Watson stated at the hearing that he would need a continuance if the court granted his request. He asserts that

[3]A defendant who has exercised his right to self-representation does not have a right to standby or advisory counsel. *See United States v. Kienenberger*, 13 F.3d 1354, 1356 (9th Cir. 1994) (providing accused has no constitutional right to advisory counsel); *see also Wheby v. Warden*, 95 Nev. 567, 568-69, 598 P.2d 1152, 1153 (1979), *overruled on other grounds by Keys v. State*, 104 Nev. 736, 766 P.2d 270 (1988).

because the subsequent appointment of substitute counsel necessitated a continuance, his motion could not be untimely. However, the continuance was not granted until after the district court denied his motion and appointed new counsel. Considering the lateness of Watson's equivocal request, the district court did not abuse its discretion in denying his motion to represent himself. *See Harris v. State*, 113 Nev. 799, 802, 942 P.2d 151, 153-54 (1997) (noting that this court gives deference to district court's determination of whether a defendant understands the risks and disadvantages of self-representation).

*Penalty-phase issues*

*Mitigation instruction*

Watson argues that the district court erred in giving the following instruction regarding the definition of mitigation:

> Mitigating circumstances are those factors which, while they do not constitute a legal justification or excuse for the commission of the offense in question, may be considered, in the estimation of the jury, in fairness and mercy, as extenuating or reducing the degree of the Defendant's moral culpability.
>
> You must consider any aspect of the Defendant's character or record and any of the circumstances of the offense that the Defendant proffer[s] as a basis for a sentence less than death.
>
> In balancing aggravating and mitigating circumstances, it is not the mere number of aggravating circumstances or mitigating circumstances that controls.

He suggests that the jury would have understood the term "moral culpability" in the first paragraph as a reference to his guilt or blameworthiness and therefore would have ignored any mitigating

evidence unrelated to his moral culpability for committing the crime, such as aspects of his character or record that were unrelated to the crime. Watson did not object to this instruction at trial. "Generally, the failure to clearly object on the record to a jury instruction precludes appellate review" absent plain error affecting the defendant's substantial rights. *Green v. State*, 119 Nev. 542, 545, 80 P.3d 93, 95 (2003).

The threshold question is whether the instruction is a correct statement of the law. Our review is de novo. *Nay v. State*, 123 Nev. 326, 330, 167 P.3d 430, 433 (2007). We start that review by looking at the scope of mitigating circumstances.

"The Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence." *Boyde v. California*, 494 U.S. 370, 377 (1990). Mitigation evidence includes "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death," *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *see* NRS 200.035; accordingly, mitigation is not limited to evidence "which would tend to support a legal excuse from criminal liability," *Eddings v. Oklahoma*, 455 U.S. 104, 113 (1982). *See Browning v. State*, 124 Nev. 517, 526, 188 P.3d 60, 67 (2008) (acknowledging that capital penalty hearing is focused on defendant's character, record, and circumstances of offense); *McKenna v. State*, 114 Nev. 1044, 1052, 968 P.2d 739, 744 (1998) (same).

The challenged instruction's first paragraph focuses on circumstances that speak to the defendant's "moral culpability." The original source of the language in that paragraph seems to be the definition of "mitigating circumstances" found in an early edition of *Black's Law Dictionary*: "'Mitigating circumstances' are such as do not

constitute a justification or excuse of the offense in question, but which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability." *Black's Law Dictionary* 780-81 (1st ed. 1891). Although this definition appeared in a death penalty case as early as 1928, *see, e.g., People v. Leong Fook*, 273 P. 779, 781 (Cal. 1928), its use in death penalty cases in Nevada seems to be of more recent vintage. For example, the language was used in an instruction defining mitigating circumstances during a Clark County capital trial in 1994.[4] *See Evans v. State*, 112 Nev. 1172, 1185, 1203 n.31, 926 P.2d 265, 274, 285 n.31 (1996).[5] The defendant in that case did not object to the instruction, and we observed that the instruction "clarified any possible confusion" that the jury might have had concerning the meaning of mitigating circumstances based on the initial instruction that the jury received.[6] *Id.* at 1204, 926 P.2d at 286. This

---

[4]We are not aware of any instances of this definition being used in Nevada capital trials before 1994, and the parties have not identified any such instances.

[5]In *Evans*, the jury requested a "Black's Law or proper definition" of mitigating circumstances during penalty-phase deliberations. 112 Nev. at 1203, 926 P.2d at 285. The district court responded by giving an instruction that is similar to the first paragraph of the instruction challenged in this case: "'Mitigating circumstances are things which do not constitute a justification or excuse of the offense in question, but which in fairness and mercy may be considered as extenuating or reducing the degree of moral culpability.'" *Id.* at 1203 n.31, 926 P.2d at 285 n.31.

[6]The initial instruction given in *Evans* read, in part: "Any aspect of the defendant's character or record and any of the circumstances of the offense, including any desire you may have to extend mercy to the defendant, which a jury believes is a basis for imposing sentence less than death may be considered a mitigating factor." 112 Nev. at 1204, 926 P.2d at 285 (emphasis omitted).

court has not addressed whether the term "moral culpability" as used in the instruction misstates the law as to the scope of mitigating circumstances.[7]

The term "culpability" is defined as "blameworthiness" or "guilt" in both legal and ordinary usage. *Black's Law Dictionary* 435 (9th ed. 2009); *Webster's Third New International Dictionary* 552 (2002). Thus understood, "culpability" relates to the crime and whether the defendant is blameworthy, *see Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986) (using "culpability" in reference to crime), which describes the inquiry at the guilt phase of a capital trial. The inquiry at the penalty phase of a capital trial is different—whether the defendant is worthy of a death sentence. Phyllis L. Crocker, *Concepts of Culpability and Deathworthiness: Differentiating Between Guilt and Punishment in Death Penalty Cases*, 66 Fordham L. Rev. 21, 22-27 (1997). This is not to say that circumstances that extenuate or reduce a defendant's moral culpability but are not sufficient to justify or

---

[7]This court's opinion in *Thomas v. State* refers to an instruction that includes the "moral culpability" language, but it does so in the court's analysis of a prosecutorial-misconduct claim; the opinion does not address the issue presented in this case. 122 Nev. 1361, 1370, 148 P.3d 727, 733 (2006).

The State suggests that the challenged instruction was approved by the United States Supreme Court in *Kansas v. Marsh*, 548 U.S. 163 (2006). We disagree. The *Marsh* opinion merely mentioned the Kansas instruction and did not specifically approve of it or address the issue presented here. *Id.* at 176-77. Additionally, the instruction mentioned in *Marsh* is phrased differently than the instruction used in this case; it defined mitigating circumstances as any circumstances that "may be considered as extenuating or reducing the degree of moral culpability or blame *or* which justify a sentence of less than death." *Id.* at 176 (emphasis added) (internal quotation marks omitted).

excuse the offense for purposes of guilt are irrelevant to the jury's determination whether to impose a sentence less than death. *See Skipper*, 476 U.S. at 13-14 ("Evidence concerning *the degree of the defendant's participation in the crime*, or his age and emotional history, thus bear directly on the fundamental justice of imposing capital punishment." (emphasis added)). In fact, several such circumstances are included as statutory mitigating circumstances in Nevada. *See* NRS 200.035.[8] But the defendant's moral culpability is not the sole consideration; therefore,

---

[8]NRS 200.035 provides as follows:

> Murder of the first degree may be mitigated by any of the following circumstances, even though the mitigating circumstance is not sufficient to constitute a defense or reduce the degree of the crime:
>
> 1. The defendant has no significant history of prior criminal activity.
>
> 2. The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance.
>
> 3. The victim was a participant in the defendant's criminal conduct or consented to the act.
>
> 4. The defendant was an accomplice in a murder committed by another person and the defendant's participation in the murder was relatively minor.
>
> 5. The defendant acted under duress or under the domination of another person.
>
> 6. The youth of the defendant at the time of the crime.
>
> 7. Any other mitigating circumstance.

an instruction that limits mitigating circumstances to factors that extenuate or reduce a defendant's moral culpability misstates the law.

The instruction given in this case is subject to two interpretations. Read as a whole, the instruction requires the jury to consider factors that extenuate or reduce the defendant's moral culpability *and* any aspect of the defendant's character or record and any circumstances of the offense. In particular, the breadth of possible mitigation evidence is conveyed in the second paragraph of the instruction: "You must consider any aspect of the Defendant's character or record and any of the circumstances of the offense that the Defendant proffer[s] as a basis for a sentence less than death." Alternatively, the phrasing of the first paragraph, which refers to mitigating circumstances as those factors that "extenuat[e] or reduc[e] the degree of the Defendant's moral culpability," could be understood to limit the jury to consideration of only those factors that are offense-related and therefore extenuate or reduce the defendant's guilt or blameworthiness. Given these competing interpretations, "the proper inquiry . . . is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant [mitigating] evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). A "reasonable likelihood" is more than a mere possibility that the jury misunderstood the law, but a defendant "need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction." *Id.*

We are not convinced that there is a reasonable likelihood that the jury misunderstood the first paragraph of the instruction to preclude it from considering any aspect of Watson's character or record as a mitigating circumstance regardless of whether it reflected on his moral

culpability. First, the interpretation that would result in a misunderstanding of the law is not a natural reading of the instruction as a whole. Nothing in the language of the instruction would readily suggest that the language in the first paragraph required the jury to ignore the broad second paragraph. Second, it seems unlikely that a jury would read the first paragraph as suggested by Watson when courts have used "culpability" in the penalty context without expressing any concern that it limits the jury to consideration of circumstances that are related to the crime and the defendant's guilt. *See, e.g., Abdul-Kabir v. Quarterman*, 550 U.S. 233, 263-64 (2007) ("[B]efore a jury can undertake the grave task of imposing a death sentence, it must be allowed to consider a defendant's moral culpability and decide whether death is an appropriate punishment for that individual in light of his personal history and characteristics and the circumstances of the offense."); *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("Underlying *Lockett* and *Eddings* is the principle that punishment should be directly related to the personal culpability of the criminal defendant. If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, 'evidence about the defendant's background and character is relevant . . . .'" (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring))), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002). As the Supreme Court has observed, "[j]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might." *Boyde*, 494 U.S. at 380-81. Finally, although "arguments of counsel generally carry less weight with a jury than do instructions from the court," *id.* at 384, given the arguments of counsel during the penalty phase that focused on background, character, and other circumstances

unrelated to the crime, it is unlikely that the jury would have believed that that evidence could not be considered. These reasons also suggest that any possible error in the instruction is not "so unmistakable that it reveals itself by a casual inspection of the record," *Patterson v. State*, 111 Nev. 1525, 1530, 907 P.2d 984, 987 (1995) (internal quotation marks omitted); therefore, Watson has not demonstrated plain error.[9]

*Motion to continue*

Watson argues that the district court erred in denying a motion to continue. He asserts that the continuance was necessary to permit him more time to prepare his case in mitigation because counsel did not obtain records related to his previous psychiatric hospitalization until the day that the jury returned its guilty verdicts.

The decision to deny a motion for a continuance is reviewed for an abuse of discretion. *Rose v. State*, 123 Nev. 194, 206, 163 P.3d 408, 416 (2007). There was no such abuse in this case. The district court's decision

---

[9]We encourage district courts to revise the challenged instruction to avoid the possibility of an erroneous interpretation. For example, the following language could be used in place of the first and second paragraphs:

> A mitigating circumstance is any factor which you believe is a basis for imposing a sentence less than death. Such circumstances may include, but are not limited to: any aspect of the defendant's character, background, or record; any factor that extenuates or reduces the degree of the defendant's moral culpability, regardless of whether it constitutes a legal justification or excuse for the offense; any circumstances of the offense; or any desire you may have to extend mercy to the defendant.

did not leave the defense with inadequate time to prepare for the penalty hearing, *see Higgs v. State*, 126 Nev. 1, 9, 222 P.3d 648, 653 (2010) ("This court has held that generally, a denial of a motion to continue is an abuse of discretion if it leaves the defense with inadequate time to prepare for trial."); Watson's trial attorneys began representing him roughly one year before his trial began, he had been represented by other attorneys over the several years that the case had been pending before his trial counsel became involved in the case, and Watson could have revealed the information at issue to counsel had he chosen to do so. Watson also fails to demonstrate that he was prejudiced by the denial of the continuance, *see Rose*, 123 Nev. at 206, 163 P.3d at 416 ("[W]hen a defendant fails to demonstrate that he was prejudiced by the denial of a continuance, the district court's decision denying a continuance is not an abuse of discretion."), where he had consistently maintained that his religious beliefs mandated that he not pursue a case in mitigation, *see Detrich v. Ryan*, 677 F.3d 958, 977 (9th Cir. 2012) (recognizing "a defendant's informed wishes can justify failing to present mitigating evidence" (emphasis omitted)), *vacated in part on other grounds and remanded*, 740 F.3d 1237 (9th Cir. 2013), *cert. denied*, 572 U.S. ___, 134 S. Ct. 2662 (2014), counsel was able to use the records during the penalty hearing, and the records indicated that Watson had been diagnosed and treated for mental illness several decades before the instant crime, which involved a carefully planned and executed murder. The district court did not abuse its discretion.

*Competency*

Watson argues that the district court erred in denying his request for a competency evaluation following the guilt phase of the trial

because none of the prior evaluators had access to his extensive history of mental illness. We disagree.

Roughly one year before trial, Watson was found competent to stand trial. The record shows that he responded appropriately when questioned by the court during pretrial proceedings and that he drafted his own pleadings. In addition, Watson responded appropriately during questioning by the court during the *Faretta*[10] canvas. The discovery of decades-old psychiatric records and insinuation that stress from the guilty verdict rendered him incompetent were insufficient to cast reasonable doubt on his competency given that he did not exhibit any behavior during the prior proceedings that called into doubt his ability to understand the nature of the proceedings or assist counsel. *See Scarbo v. Eighth Judicial Dist. Court*, 125 Nev. 118, 122, 206 P.3d 975, 977 (2009) (holding that a defendant is competent to stand trial if he has the "ability to understand the nature of the criminal charges and the nature and purpose of the court proceedings, and by his or her ability to aid and assist his or her counsel in the defense at any time during the proceedings with a reasonable degree of rational understanding"). While Watson's decision to forgo the presentation of mitigation evidence may seem irrational to some, that decision was his alone, *see Detrich*, 677 F.3d at 977, and it was one that he had consistently maintained throughout the proceedings. Nothing in the record indicates that Watson did not understand the nature and purpose of the penalty hearing or that he was unable to assist his counsel during the proceeding. Because Watson failed to demonstrate reasonable doubt

---

[10]*Faretta v. California*, 422 U.S. 806 (1975).

SUPREME COURT
OF
NEVADA

(O) 1947A

as to his competency to stand trial, *see Olivares v. State*, 124 Nev. 1142, 1147-48, 195 P.3d 864, 868 (2008); *see also* NRS 178.400(1) ("A person may not be tried or adjudged to punishment for a public offense while incompetent."), the district court did not abuse its discretion in denying the request for further competency proceedings, *see Olivares*, 124 Nev. at 1147-48, 195 P.3d at 868.

### *Aggravating circumstances*

Watson contends that there was insufficient evidence to support the two aggravating circumstances found by the jury. We disagree. There was sufficient evidence that the murder occurred in the commission of a first-degree kidnapping. The evidence shows that Watson inveigled Evey to travel to Las Vegas for the purpose of killing her. *See* NRS 200.310(1). In particular, Watson had verbalized his desire to murder Evey in order to protect his life savings; he then threw a surprise birthday party for her, which was an unusual thing for him to do, and, as part of the birthday celebration, planned a trip to Las Vegas for the couple; he booked two hotel rooms, one under his own name and the other, at a separate hotel, where Evey's blood was discovered, under an alias for which he had false identification; and although Evey flew to Las Vegas, Watson traveled separately with a firearm. As to the torture and mutilation aggravating circumstance, the State introduced letters that Watson had written to his children in which he admitted to dismembering Evey and cooking parts of her body in an attempt to conceal her death. This admission was corroborated by the pan and utensils recovered from Watson's hotel room; evidence that Watson purchased a band saw, plastic bags, and cleaners; and the large amount of Evey's blood that had soaked through the carpet in the hotel room. This evidence was sufficient for the

jury to conclude that the murder involved "mutilation beyond the act of killing itself" that "cut off or permanently destroy[ed] a limb or essential part of [Evey's] body." *Smith v. State*, 114 Nev. 33, 39, 953 P.2d 264, 267 (1998) (internal quotation marks omitted); *Deutscher v. State*, 95 Nev. 669, 677, 601 P.2d 407, 412-13 (1979).[11]

*Mandatory review*

NRS 177.055(2) requires that this court review every death sentence and consider whether: (1) sufficient evidence supports the aggravating circumstances found; (2) the verdict was rendered under the influence of passion, prejudice, or any other arbitrary factor; and (3) the death sentence is excessive. First, as explained above, sufficient evidence supported the two aggravating circumstances found. Second, nothing in the record indicates that the jury reached its verdict under the influence of passion, prejudice, or any arbitrary factor. And third, considering the calculated nature in which Watson planned the murder and dismemberment of his wife and the evidence in mitigation, we conclude that Watson's death sentence was not excessive.

---

[11]Watson argues that the cumulative effect of the errors committed during his trial warrant reversal of his conviction and sentence. "The cumulative effect of errors may violate a defendant's constitutional right to a fair trial even though errors are harmless individually." *Hernandez v. State*, 118 Nev. 513, 535, 50 P.3d 1100, 1115 (2002). However, a defendant is not entitled to a perfect trial, merely a fair one. *Ennis v. State*, 91 Nev. 530, 533, 539 P.2d 114, 115 (1975). Because we have found no error, there is nothing to cumulate.

Because review of this appeal reveals no errors that would warrant a new trial or penalty hearing, we affirm the judgment of conviction.

_____, C.J.
Gibbons

We concur:

_____, J.
Pickering

_____, J.
Hardesty

_____, J.
Parraguirre

_____, J.
Douglas

SUPREME COURT
OF
NEVADA

(O) 1947A

CHERRY and SAITTA, JJ., dissenting in part:

In our view, the district court plainly erred in defining mitigating circumstances as those circumstances that reduce the defendant's degree of moral culpability. *See Green v. State*, 119 Nev. 542, 545, 80 P.3d 93, 94-95 (2003) (reviewing unobjected-to jury instruction for plain error affecting the defendant's substantial rights). The instruction is not properly rooted in Nevada statutory authority to provide necessary direction to the jury. We further conclude that this error affected Watson's substantial rights and we would reverse the judgment of conviction and remand for a new sentencing hearing.

In 1972, the United States Supreme Court held that the death penalty, as it had been applied, violated the Eighth and Fourteenth Amendments of the United States Constitution because the procedures employed to sentence defendants created "a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner." *Godfrey v. Georgia*, 446 U.S. 420, 427 (1980); *Anderson v. State*, 90 Nev. 385, 528 P.2d 1023 (1974) (citing *Furman v. Georgia*, 408 U.S. 238 (1972)). The nation's hiatus from the death penalty was short-lived. State legislatures amended their statutes in an attempt to restore the punishment to constitutionality and, by 1976, the United States Supreme Court approved of the penalty schemes in Florida and Georgia. *Gregg v. Georgia*, 428 U.S. 153, 198-207 (1976); *Proffitt v. Florida*, 428 U.S. 242, 253 (1976). To survive constitutional scrutiny, capital sentencing procedures must "(1) rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized

sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." *Kansas v. Marsh*, 548 U.S. 163, 173-74 (2006). The jury must be free to consider "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion). Our Legislature amended the capital punishment scheme in 1977 to address the concerns of *Furman* and *Gregg* and limit the jury's discretion in imposing death sentences. *See Deutscher v. State*, 95 Nev. 669, 676, 601 P.2d 407, 412 (1979). The statutes generally limit the discretion afforded the jury, but "are constitutional because they 'provide for a consideration of any mitigating factor the defendant may want to present.'" *Id.* at 676-77, 601 P.2d at 412 (quoting *Bishop v. State*, 95 Nev. 511, 517, 597 P.2d 273, 277 (1979)); *see Gregg*, 428 U.S. at 196-97. Any instruction to the jury concerning the use of mitigation evidence must be born of these statutes in order to guide the discretion of the jury in a constitutional manner. But that was not the case here.

Instead, the moral culpability instruction given in this case came from a dictionary, *see* Henry Campbell Black, *Dictionary of Law* 780-81 (1st ed. 1891) ("Mitigation . . . . 'Mitigating circumstances' are such as do not constitute a justification or excuse of the offense in question, but which in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability."), and had originated from an action for slander, Black, *Dictionary of Law* 785 (2d ed. 1910) (citing *Heaton v. Wright*, 10 How. Pr. 79, 82 (N.Y. 1854)). Despite its origin in

civil law, courts adopted the instruction for their most serious cases as early as 1928. *See generally People v. Leong Fook*, 273 P. 779, 781 (Cal. 1928); *Commonwealth v. Williams*, 160 A. 602, 609 (Pa. 1932). Many jurisdictions have modified the language to reflect a definition of mitigating circumstances that extends beyond moral culpability to any circumstances that warrant a sentence less than death. *See, e.g., Kansas v. Marsh*, 548 U.S. 163, 176 (2006) (Kansas instructions use "reducing the degree of moral culpability or blame *or which justify a sentence of less than death*" (internal quotations omitted) (emphasis added)); *Buchanan v. Angelone*, 522 U.S. 269, 285 (1998) (Virginia instructions use "reduce the degree of moral culpability *and punishment*" (internal quotations omitted) (emphasis added)); *State v. Breton*, 663 A.2d 1026, 1052 & n.46 (Conn. 1995) (Connecticut instructions use "reduce the degree of his culpability or blame for the offense *or to otherwise constitute a basis for a sentence less than death*" (internal quotations omitted) (emphasis added)); *State v. Brett*, 892 P.2d 29, 61 (Wash. 1995) (Washington instructions use "reducing the degree of moral culpability *or which justifies a sentence of less than death*" (internal quotations omitted) (emphasis omitted) (emphasis added)); *State v. Moose*, 313 S.E.2d 507, 518 (N.C. 1984) (North Carolina's definition includes, "reducing the moral culpability of killing *or making it less deserving of the extreme punishment* than other first-degree murders" (emphasis and internal quotation omitted)); *see also State v. Holloway*, 527 N.E.2d 831, 835 (Ohio 1988) ("[M]itigating factors under [Ohio law] are not related to a defendant's culpability but, rather, are those factors that are relevant to the issue of whether an

offender . . . should be sentenced to death."). Although we have referenced a similar instruction in three published cases, this court has never specifically addressed the "moral culpability" language in the instruction. *See Nunnery v. State*, 127 Nev. ___, ___, 263 P.3d 235, 257 (2011) (explaining that instruction grants jurors the discretion to find mitigating circumstances); *Thomas v. State*, 122 Nev. 1361, 1370, 148 P.3d 727, 733 (2006) (explaining that State's improper causation argument was not prejudicial because instruction does not require causation between mitigating factors and the crime); *Evans v. State*, 112 Nev. 1172, 1204, 926 P.2d 265, 285-86 (1996) (referencing instruction but citing a different definition of mitigating circumstances with approval).

It is no small task to ask a jury to decide whether to impose a death sentence. Given the weight of their decision, jurors are entitled to instructions that clarify the law authorizing the penalty to guide their discretion in imposing the punishment. In light of this concern, the instruction's history, United States Supreme Court precedent, and statutory amendments to the death penalty procedure, the district court plainly erred in giving the instruction. The instruction is simply inconsistent with the statutory language defining mitigating circumstances. It defined mitigating circumstances as factors which "extenuat[e] or reduc[e] the degree of the Defendant's moral culpability." Admittedly, most of the enumerated factors in the statute relate to the facts of the crime and, therefore, the defendant's moral culpability. *See* NRS 200.035. But the statute is broader; its definition of mitigating circumstances includes facts concerning the defendant or any other

circumstance that the jury might find mitigating. *See* NRS 200.035(1), (7); *see also Eddings v. Oklahoma*, 455 U.S. 104, 113 (1982) (noting mitigation evidence not limited to evidence "which would tend to support a legal excuse from criminal liability"); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (defining mitigation evidence as "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death"). Moreover, unlike the given instruction, the statute includes specific, concrete examples that are necessary to guide the jury in its deliberations.

The given instruction likely confused the jury and improperly limited its consideration of mitigating evidence. *See Boyde v. California*, 494 U.S. 370, 377-78 (1990) ("The Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence."); *see also Browning v. State*, 124 Nev. 517, 526, 188 P.3d 60, 67 (2008) (acknowledging that capital penalty hearing is focused on defendant's character, record, and circumstances of offense); *McKenna v. State*, 114 Nev. 1044, 1052, 968 P.2d 739, 744 (1998) (same). The majority acknowledges that "culpability" relates to whether the defendant is blameworthy and that the first paragraph of the instruction could be viewed as restricting the jury's consideration of mitigation evidence. However, it concludes that the second paragraph was sufficient to direct the jury to consider all evidence relevant to mitigating circumstances. We do not agree with this conclusion. The first paragraph clearly characterized mitigating evidence as only offense-related evidence. The second paragraph directs the jury to consider aspects of the defendant's

character or record, but does not brand that information as mitigating evidence. Thus, the facts about the defendant's character stand apart from the mitigation evidence in the minds of the jurors and it is likely that the jury would not consider those facts in weighing the aggravating and mitigating circumstances. Pursuant to the given instruction, the jury could readily and incorrectly assume the facts related to the defendant's character or record were mere "other matter" evidence to be considered after the weighing process was complete. *See Skipper v. South Carolina,* 476 U.S. 1, 5 (1986) (explaining that evidence unrelated to defendant's culpability is still mitigating because it "might serve 'as a basis for a sentence less than death.'" (quoting *Lockett,* 438 U.S. at 604)); *People v. Lanphear,* 680 P.2d 1081, 1083 (Cal. 1984) (en banc) (finding constitutional error when "no sympathy" instruction was combined with instruction suggesting that only circumstances that lessen moral culpability are to be considered as mitigating circumstances); *see also Nevius v. State,* 101 Nev. 238, 250-51, 699 P.2d 1053, 1061 (1985) (citing *Lanphear* and implying that an instruction would be erroneous if it suggested that only circumstances that lessen moral culpability should be considered as mitigation). The majority contends that because the phrase "moral culpability" has been used so broadly, albeit incorrectly, in the past, it was unlikely the jury felt limited in what evidence it could consider. We believe the jury's sentencing decision is too important to accept refuge in ambiguity. It is our view that the jury likely applied the instruction in a way that prevented it from considering relevant evidence and that the district court plainly erred in instructing the jury using

language that reasoned jurists and attorneys have used with such imprecision. *See, e.g., Abdul-Kabir v. Quarterman*, 550 U.S. 233, 263-64 (2007) ("[B]efore a jury can undertake the grave task of imposing a death sentence, it must be allowed to consider a defendant's moral culpability and decide whether death is an appropriate punishment for that individual in light of his personal history and characteristics and the circumstances of the offense."); *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("Underlying *Lockett* and *Eddings* is the principle that punishment should be directly related to the personal culpability of the criminal defendant. If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, 'evidence about the defendant's background and character is relevant . . . .'" (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring))), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002). We should not expect jurors "to be legal experts nor make legal inferences with respect to the meaning of the law; rather, they should be provided with applicable legal principles by accurate, clear, and complete instructions specifically tailored to the facts and circumstances of the case." *Crawford v. State*, 121 Nev. 744, 754, 121 P.3d 582, 588 (2005).

We further conclude that the erroneous instruction affected Watson's substantial rights. *See* NRS 178.602; *Green v. State*, 119 Nev. 542, 545, 80 P.3d 93, 95 (2003). Watson presented documentation showing that he had suffered from mental illness and had received psychiatric treatment. The jury, however, found no mitigating circumstances present. The majority contends that this could suggest that the mitigation evidence

was not sufficiently compelling; however, considering the breadth of time between Watson's diagnosis and the crime, the jury most likely did not consider it to be evidence in mitigation as defined by the given instructions. Therefore, we would conclude that there was "a reasonable likelihood that the jury . . . applied the challenged instruction in a way that prevent[ed] the consideration of constitutionally relevant evidence." *Boyde*, 494 U.S. at 380; *see Ayers v. Belmontes*, 549 U.S. 7, 16-17 (2006).

_____, J.
Cherry

_____, J.
Saitta